**Jeanne RASMUSSEN et al., Plaintiffs,**

v.

**Philip TOIA, Individually and as Executive Deputy Commissioner of the New York State Department of Social Services, et al., Defendants.**

**No. 76 Civ. 2119 (CSH).**

United States District Court,
S. D. New York.

Sept. 13, 1976.

MFY Legal Services, Inc., New York City, Ellice Fatoullah, Nancy E. LeBlanc, New York City, of counsel; Monroe County Legal Assistance Corp., Kingston, N.Y., Bryan D. Hetherington, Mid-Hudson Valley Legal Services Project, Kingston, N.Y., of counsel; Community Action for Legal Services, New York City, Marttie L. Thompson, Michael A. O'Connor, New York City, of counsel, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of State of N.Y., New York City, Samuel A. Hirshowitz, Asst. Atty. Gen., David L. Birch, Deputy Asst. Atty. Gen., of counsel, for defendants.

Before MULLIGAN, Circuit Judge, and HAIGHT and MOTLEY, District Judges.

## MEMORANDUM AND ORDER

HAIGHT, District Judge.

Plaintiffs by this action seek to have this Court declare unconstitutional and permanently enjoin the operation of a recently enacted New York statute which substantially modifies the eligibility requirements for the receipt of benefits under that State's "Home Relief" program. Jurisdiction is predicated on 28 U.S.C. § 1343(3), (4) which confers original jurisdiction on this Court over all suits, such as the instant proceeding, authorized by 42 U.S.C. § 1983. Declaratory relief is prayed for pursuant to 28 U.S.C. §§ 2201, 2202.

Plaintiffs, who also pray for class certification, contend that application of the statute at issue would violate rights guaranteed them under the Equal Protection and Due Process clauses of the Fourteenth Amendment to the United States Constitution.

After a hearing, the single District Judge to whom the case was initially assigned, accepted federal jurisdiction over the matter because plaintiffs' moving papers raised substantial constitutional issues within the meaning of *Goosby v. Osser*, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973) and *Ex Parte Poresky*, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933), see also *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), and issued a temporary restraining order. This three judge statutory court was subsequently convened pursuant to 28 U.S.C. §§ 2281, 2284, and the original temporary restraining order continued pending resolution of the case.

We vacate the restraining order and dismiss the complaint.

### I.

### *Factual Background*

"Home Relief" is a general assistance program, financed and administered solely by New York State and its local subdivisions, for the benefit of needy persons unable to support themselves or to secure support from other sources. New York Social Services Law §§ 157–166. This residual category of individuals qualified to receive Home Relief if defined by N.Y. Social Services Law § 158(a) to include:

"Any person unable to provide for himself, or who is unable to secure support from a legally responsible relative, who is not receiving needed assistance or care under other provisions of this chapter, or from other sources . . . ." [1]

Prior to March 30, 1976, Home Relief could be obtained by applying to the local social services center and making the requisite showing of eligibility. As to persons under 21, Departmental Regulation 370.-4(g)(1), (2) and (3), (18 N.Y.C.R.R. § 370.4) required the Social Services Administration to determine the existence and whereabouts of legally responsible relatives, their ability to contribute to the applicant's upkeep, and to institute support proceedings in the applicant's name against such relatives where appropriate. Home Relief, however, was not denied an applicant during this inquiry or pending resolution of a support proceeding.

On March 30, 1976 the New York State Legislature enacted Section 15 of Chapter 76 of the 1976 Laws of New York ("§ 15"), amending Section 158 of the New York Social Services Law to read as follows:

" . . . [N]o person under the age of twenty-one years except a married person living with their spouse, living apart from a legally responsible relative shall be eligible for home relief unless a proceeding has been brought by or on behalf of such person to compel such legally responsible relative to provide for or contribute to such person's support *and until an order of disposition has been entered in such proceeding.*" (emphasis added).

---

[1] Although Home Relief is mainly received by minors living away from their family's residence and unsupported by a legally responsible relative, examples of other persons qualified to receive its benefits include impoverished adults, under 65, who are not blind or disabled, or employed individuals whose salaries preclude them from participation in the Aid to Families with Dependent Children ("AFDC") program, but whose income is deemed insufficient under State guidelines to support their families.

Section 18 of Chapter 76 of the 1976 Law of New York provided that Section 15 would take effect 45 days from its enactment, or on May 14.

Implementation of the above legislation commenced on April 16 when defendant Toia, acting Commissioner of the State Department of Social Services, caused the issuance of an administrative letter (76 ADM–35) to social services personnel instructing them to (1) identify all affected recipients and/or applicants; (2) inform them by letter of the new requirement and (3) where necessary, to institute the support proceeding on behalf of the recipient. 76 ADM–35 further directed that a form letter entitled "Notice of Intent to Discontinue Public Assistance" warning recipients of their impending termination from the program be mailed on May 4, effective May 14 (see Statement of Agreed Facts, Exhibit A). The above Notice also informed recipients of their right to a state fair hearing.

On April 30, defendant Smith, Social Services Commissioner of New York City, promulgated IM 17/76 (see Statement of Agreed Facts, Exhibit B), which outlined the implementation of the new law in greater detail.

Finally, defendant Toia clarified his previous directive, when, on May 7, he informed the appropriate social services personnel that the new enactment did not require a Family Court disposition where evidence, preferably consisting of official documentation, indicated that the legally responsible relative(s) was deceased or receiving public assistance or Supplemental Income benefits (see 76 ADM–45, attached as Exhibit C to the Statement of Agreed Facts).

In order to obtain an order of disposition from Family Court, an individual must first be interviewed by a probation officer, who may thereafter arrange a further conference with the relative(s) from whom support is sought. Between one to six weeks may elapse between the request for the initial interview and its occurrence; a further delay of one to three weeks is normally encountered between the interview and conference.

In approximately 40% of the cases, the responsible relative appears and consents to maintain the minor at a stipulated rate. Where such an agreement is not reached, a petition is filed and an initial fact-finding hearing before a Family Court judge scheduled, usually between one and four weeks subsequent to the filing of the petition. Statistics of the Family Court demonstrate that on the average, $4\frac{2}{3}$ hearings are held on each petition before a final adjudication; moreover, additional delays may be encountered in entering an order, or where the respondent lives outside of jurisdiction of petitioner's residence, thereby necessitating a reciprocal support proceeding in the county of respondent's residence.

It should be noted that in two counties (Sullivan and Rockland), arrangements were made by the Family Court to issue such orders prior to May 14 in all cases where the petitions are uncontested. It does not appear that the remaining Family Courts are similarly prepared, and thus, it appears that in the great majority of cases the Family Court disposition may entail a waiting period of between five to twelve months from initiation to issuance. (See Statement of Agreed Facts, Exhibit I).

The named plaintiffs herein illustrate the variety of bureaucratic delays one may encounter in attempting to gain an order of disposition in a Family Court support proceeding. Plaintiff Jeanne Rasmussen, an Ulster County Home Relief recipient, filed her support petition on the same day she received instruction to do so, but nonetheless has been informed that no adjudication can be timely made in her case, since her responsible relative is a resident of a different county (Dutchess County) than plaintiff (Ulster County), thus requiring the time-consuming transmission of Family Court papers. Likewise, plaintiff Marybeth Haley, an Ulster County recipient, promptly commenced a Family Court proceeding but (had it not been for the temporary restraining order) would have been terminated from Home Relief because her initial hear-

ing was set for June 10, and she was informed that respondent would contest liability. Plaintiff Gravett is a recent Home Relief applicant residing in Queens County who has been shuttled back and forth between the social services department and the Family Court, where she has been unable to prosecute a support petition due to the unknown whereabouts of her legally responsible relative. Plaintiff Hollowell, also a recent Home Relief applicant residing in Queens County, was informed that she would be unable to obtain an appointment to file her petition until some indeterminate time after August 1, 1976. It therefore appears that despite the 45 day grace period provided by Section 18, none of the named plaintiffs herein have been or are able to seasonably procure the necessary court action although they have been diligent in their attempts.

On May 11, 1976, counsel for plaintiffs initiated the instant action by the filing of a complaint, and by procuring on that day an order to show cause on May 13 why a temporary restraining order should not issue against the operation of the amended statute. Subsequent to that hearing at which further evidence was adduced, the district judge found that federal jurisdiction existed because sufficient constitutional questions had been raised, and further, granted plaintiffs an order temporarily restraining operation of § 15 pending resolution of the issues by the appropriate three judge panel.

An amended complaint was served and filed on June 11, adding Pamela Gravett and Nadine Hollowell as named plaintiffs, and further affidavits were submitted on behalf of the plaintiffs. The defendants answered on June 14, and simultaneously moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for "judgment on the pleadings." The following day a lengthy "Statement of Agreed Facts" was filed, which supplied this Court with a satisfactory factual basis for its decision. Oral argument was held before this three judge court on June 21, and additional memoranda were proffered. With the concurrence of all parties, the issues became fully submitted on July 16.

## II.

### Legislative Purpose

Based upon the materials presented to the court, including the legislative preamble to the statute in question, the language of § 15 and the circumstances of its enactment, and the detailed analyses offered by both parties, it appears that the objectives of the amendment are twofold: first, it seeks to shift the burden of conducting the initial eligibility investigation from the Department of Social Services to the applicant and the Family Court. Second, the statute is aimed at protecting the integrity of the welfare rolls—that is, to insure that no Home Relief applicant/recipient, under twenty-one years of age, living away from home, has a legally responsible relative able to provide support, thereby conserving the State's limited fiscal resources. Such actions are deemed necessary to the proper allocation of public funds during a time of fiscal crises. See Chapter 76 of the Laws of New York of 1976, § 1.

## III.

### The Plaintiffs' Contentions

Although plaintiffs acknowledge that the legislative purposes stated above are permissible, they claim that the amended statute, as applied, contravenes their right to substantive and procedural Due Process and to the Equal Protection of the law as guaranteed them under the Fourteenth Amendment to the United States Constitution.

More specifically, plaintiffs contend that application of § 15 will deprive applicants/recipients of their benefits in derogation of substantive Due Process because the necessity of actually *obtaining* the final Family Court disposition, as opposed to a requirement of merely initiating a support petition, does not in any way further the valid objectives of the statute. Plaintiffs argue that the very filing of the petition places upon the applicant/recipient the responsibility for ferreting out solvent, re-

sponsible relatives. Also, the new condition of eligibility will not, in plaintiffs' submission, purge the unqualified from the Home Relief program, since the failure of its beneficiaries to have pursued their legally responsible relatives through the Family Courts may often be attributed to the Department's own advice to applicants, given pursuant to the initial screening, that such a course of action was not necessary or likely to be fruitless.

The amended statute is contrary to procedural Due Process, in plaintiffs' view, because benefits will be terminated without a meaningful prior hearing, at which, for example, payments could be continued upon a showing that the applicant/recipient was diligently prosecuting the Family Court petition, and the failure to obtain a final disposition was not attributable to the applicant/recipient.

As to Equal Protection, plaintiffs maintain that §§ 15 and 18 create two classes of Home Relief applicants/recipients—namely, those who secure the requisite court order and those who do not. This "classification" is impermissibly arbitrary, according to plaintiffs, because the ability of an individual to receive such dispositions is purely a matter of bureaucratic happenstance, and entirely beyond the control of the individual applicant. While they concede that the subject matter and objectives of the revised statute are legitimate, plaintiffs contend that the legislation should be stricken because its requirement that applicants/recipients obtain a final court decree is not rationally related to these permissible goals, and its operation will necessarily entail dissimilar treatment of individuals who are otherwise equally situated.

The defendants, by the State Attorney General, respond to the Due Process argument by noting that a statute creating an entitlement and the conditions for its receipt, may be properly modified by the legislature, and those who are affected by such statutory revision cannot object to such change as a deprivation without Due Process since the law creating the entitlement is inextricably bound up with the law defining eligibility to receive it. With reference to Equal Protection, the defendants argue that the Legislature may validly enact measures which, in application, impact on residents of different counties in differing degrees, and contend that the 45 day compliance period set forth in § 18 represents a proper exercise of legislative line drawing which may not be overridden by a federal court on the ground that a better or seemingly more reasonable alternative is advanced.

Although plaintiffs have seemingly mounted a two or three pronged assault upon § 15, the nub of their argument is quite simply that the means mandated by the statute are unrelated to the accomplishment of its objectives. The Equal Protection and procedural Due Process claims are, to a large degree, derivative from this central issue, and merely describe additional evils which may flow from the operation of a substantively irrational statute. Of course, should plaintiffs fail to establish their substantive Due process claim, they could conceivably prevail under the Equal Protection theory since under the holding of *Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970) statutory classifications will be upheld only if it is both "rationally based *and* free from invidious discrimination" (emphasis added); see also *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). Thus, the issues of both substantive rationality and Equal Protection are discussed *infra.* We begin, however, with a consideration of the permissible scope of this court's review.

### IV.

#### The Standard of Judicial Review

Welfare statutes, state and federal, play an increasing role in our society. Predictably enough, these statutes have engendered considerable litigation.

█ The applicable standard of review in measuring the constitutional validity of legislation or administrative procedures leading to the withholding of non-contractual benefits under social welfare programs has

been defined by a series of decisions of the United States Supreme Court. That standard is a restricted one, and applies both to challenges raised under Due Process and Equal Protection, *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Thus it has been held that the Constitution interposes a bar to the legislative termination of such benefits "only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification." *Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960). Disentitlement of benefits will be sustained if "the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals." *Richardson v. Belcher,* 404 U.S. 78, 84, 92 S.Ct. 254, 258, 30 L.Ed.2d 231 (1971).

■ In the area of economics and social welfare, classifications of recipients are immune from Equal Protection clause attack "if the classification has some 'reasonable basis.'" *Dandridge v. Williams, supra,* 397 U.S. at 485, 90 S.Ct. at 1161. *Dandridge* also holds that the Fourteenth Amendment "gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy", *supra* at 486, 90 S.Ct. at 1162. Furthermore, a classification in the area of social welfare is consistent with the Equal Protection clause of the Fourteenth Amendment if it is "rationally based and free from invidious discrimination," *supra* at 487, 90 S.Ct. at 1162.

The test is the same, whether the statute under attack is federal or state. *Richardson v. Belcher, supra,* 404 U.S. at 81, 92 S.Ct. 254.

In approving a section of the Social Security Act requiring the reduction of benefits under that plan where the insured had received workmen's compensation, but providing no such setoff for awards received from private companies on tort claims, the Supreme Court held that disentitlement of benefits will be sustained if "the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals." *Richardson v. Belch-*

*er, supra,* at 84, 92 S.Ct. at 258 (1971). Most recently, in *Mathews v. Lucas,* —— U.S. ——, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), the Supreme Court vindicated provisions of the Social Security Act which conditioned the eligibility of certain illegitimate children for a surviving child's insurance benefits upon a showing of paternity on the part of the deceased, and a showing of actual dependency at the time of death. Under the statutory and regulatory scheme, certain children were treated differently, as a class, from other children who had the benefit of statutory presumptions of dependency. A three-judge court ruled that the statutory classifications were constitutionally impermissible, under the Due Process clause of the Fifth Amendment; the Supreme Court reversed. The Court observed that statutory classifications are not *per se* unconstitutional; "the matter depends upon the character of the discrimination and its relation to legitimate legislative aims," *supra,* at ——, 96 S.Ct. at 2760. The Court reiterated that this sort of statute would receive only a minimal scrutiny from the courts; "the burden remains upon the appellees to demonstrate the insubstantiality" of the relation between the legislative purpose and the means adopted, *supra,* at ——, 96 S.Ct. at 2764. The Court said of the scope of its review:

"Our role is simply to determine whether Congress' assumptions are so inconsistent or insubstantial as not to be reasonably supportive of its conclusions that individualized factual inquiry in order to isolate each nondependent child in a given class of cases is unwarranted as an administrative exercise. In the end, the precise accuracy of Congress' calculations is not a matter of specialized judicial competence; and we have no basis to question their detail beyond the evident consistency and substantiality." —— U.S. at ——, 96 S.Ct. at 2767.

*Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) summarizes the current state of the law:

". . . a noncontractual claim to receive funds from the public treasury en-

joys no constitutionally protected status, *Dandridge v. Williams, supra,* though of course Congress may not invidiously discriminate among such claimants on the basis of a 'bare congressional desire to harm a politically unpopular group,' *United States Dept. of Agriculture v. Moreno,* 413 U.S. 528, 534 [93 S.Ct. 2821, 2826, 37 L.Ed.2d 782] (1973), or on the basis of criteria which bear no rational relation to a legitimate legislative goal. *Jimenez v. Weinberger,* 417 U.S. 628, 636 [94 S.Ct. 2496, 2501, 41 L.Ed.2d 363] (1974); *United States Dept. of Agriculture v. Murry,* 413 U.S. 508, 513–514 [93 S.Ct. 2832, 2835, 37 L.Ed.2d 767] (1973)." 422 U.S. at 772, 95 S.Ct. at 2470.

■ The present plaintiffs are fully aware of the thrust of these cases. They acknowledge that § 15 falls within the domain of state economic regulation, not impinging upon a "fundamental right", see e. g., *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), or involving a "suspect classification", see e. g., *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and as such, its constitutional validity need only be subjected to minimal judicial scrutiny. Thus, the statute, which comes before this court with a presumption of constitutionality, *F.S. Royster Guano Co. v. Virgina,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920), must be sustained if it appears that the legislative scheme is reasonably calculated to achieve the legitimate purposes ascribed to it. *Lavine v. Milne,* 424 U.S. 577, 96 S.Ct. 1010, 47 L.Ed.2d 249 (1976); *Weinberger v. Salfi, supra.*

This "two tier" system of analyzing claims of statutory unconstitutionality has been criticized (most recently in Mr. Justice Marshall's dissent in *Massachusetts Board of Retirement v. Murgia,* —— U.S. ——, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (44 U.S. L.W. 5077)), because the initial determination of whether a basic right or burdened class is involved has almost always been determinative of the court's ultimate holding. Thus, legislation which on its face intrudes upon a fundamental liberty, or

mandates dissimilar treatment to members of an underprivileged group, has seldom been able to withstand "strict scrutiny" or been justified by the necessary showing of a compelling governmental interest. Conversely, in the absence of these factors, plaintiffs have rarely convinced courts that a statute cannot pass constitutional muster under the minimal scrutiny or mere rationality test.

As a reaction to the rigidity of this "two tier" approach, some federal courts have urged adoption of a more flexible standard, see, e. g., *Citizens Committee for Faraday Wood v. Lindsay,* 507 F.2d 1065, 1068 n. 5 (2d Cir. 1974), *cert. den.,* 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975), particularly where the statute at issue involved the necessities of life. See Justice Marshall's dissent in *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). However, the Supreme Court has disregarded this suggestion and refused to employ an "intermediate test" of statutory constitutionality, *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); and see discussion in *Noel v. Chapman,* 508 F.2d 1023 (2d Cir.), *cert. den.,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), even where the contested legislation affects an individual's access to the bare essentials of life. *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Lindsay v. Normet,* 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972).

■ Nevertheless, the courts' power of review in a minimal scrutiny case, although limited, is not meaningless. While the "two tier" approach has not been abandoned, the Supreme Court has indicated that its holdings will not necessarily hinge upon the initial determination; thus, where minimal scrutiny is appropriate, the language of certain of the Court's opinions and the analysis of commentators reveal a utilization by the Supreme Court of an "intensified means scrutiny", see generally, Gunther, "The Supreme Court, 1971 Term-Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection", 86 Harv.L.Rev. 1, 33 (1972). Under

this concept, the workings of statutes, the constitutionality of which depends only upon a showing of mere rationality, must have a "significant relationship" to its purpose, *Weber v. Aetna Cas. and Sur. Co.,* 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), or must possess a "fair and substantial relation to the object of the legislation", *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971). As a result, in ruling upon the validity of legislation regulating state economic activity, the Supreme Court appears

". . . [l]ess willing to strain for conceivable justification, less ready to hypothesize imaginable facts that might underlie questionable classifications, less inclined to tolerate substantial over-and underinclusiveness in deference to legislative flexibility." Gunther, *supra,* at p. 33.

Indeed, the Supreme Court has recently noted that the rationality standard is not "toothless", *Mathews v. Lucas,* —— U.S. ——, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), and has directed that such judgments be made with reference to the context of the legislative scheme.

The Court has also said recently:

"More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Since the private interest involved in the case at bar is the means with which destitute people provide themselves with the essentials of life, and because the risks entailed by unwarranted terminations are grave ones, the applicable standard of review requires a determination of whether the operation of the statute under attack is related to its objectives in a substantive and meaningful way.

## IV.

### Substantive Rationality

■ Applying the above standard to § 15, we find that the requirement that applicants/recipients obtain a Family Court disposition in order to receive Home Relief reasonably furthers a valid objective of the statute in several ways.

■ Insofar as § 15 is aimed at insuring the integrity of the welfare rolls, the requirement serves that end by causing each recipient to update the proof of his eligibility. Thus, it may be that a significant number of recipients, although initially entitled to Home Relief, have undergone changes in their circumstances which disqualify them from continued participation in the program. In essence, the amended statute could be construed as directing that all recipients re-qualify themselves in accordance with a new set of criteria. Legislative action of this sort may be undertaken without violation of Due Process rights even where the new eligibility requirements are difficult to meet without a period of deprivation due to reasons beyond the affected individual's control.

The truth of this proposition follows from the undoubted power of the Legislature simply to abolish the entire Home Relief program and immediately reinstate it for those persons in compliance with the new eligibility guidelines. *Richardson v. Belcher, supra; Irizarry v. Weinberger,* 381 F.Supp. 1146 (S.D.N.Y.1974) (three judge court). Such a legitimate two-stage procedure does not become constitutionally infirm because the Legislature collapses it into a single step.

Second, § 15 as amended serves the purpose of detecting the unqualified in that the determination of the Family Court, based as it is upon notice and the opportunity for hearing, and frequently entailing an adversary proceeding, may be more likely to be accurate than the conclusion reached by the

Department of Social Services pursuant to its own investigation. Although the evidence before the court suggests that each applicant is screened by the Department (see Statement of Agreed Facts, Exhibit B), plaintiffs do not elaborate on the technique, extent or reliability of these administrative inquiries. Certainly, plaintiffs have not demonstrated, as is their burden, that the Department's fact finding procedures with respect to an applicant's eligibility are of equal or superior probative value to a judicial determination.

Finally, the pre-conditioning of continued assistance upon a final adjudication as opposed to the mere filing of a support petition as suggested by counsel for plaintiffs, furthers the implementation of the statute's objectives in two respects. Obviously, the simple initiation of a proceeding carries little, if any, evidentiary weight; it does no more to establish the bona fides of the applicant than any other bare allegation. More importantly, the requirement of actually receiving the order will insure diligent prosecution of the petition, and to that extent, expedite the ultimate disposition. While it may be that a litigant cannot dictate precisely when the Family Court will reach its decision, it cannot be doubted that the requirement at issue serves to motivate petitioners to press their cases, with the result that conclusive action will be taken sooner rather than later.

Thus, the court finds that the amended statute is rationally related to a valid legislative objective in that it may more effectively screen out unqualified applicants than the present system, detect current recipients who no longer merit the program's benefits, and cause both applicants and recipients to litigate their Family Court petitions with dispatch. We recognize that this result will entail some loss of benefits, perhaps for a significant number of present recipients, and that such deprivation, although temporary, will work a considerable hardship on such persons. However, the conclusion reached here is compelled by recent rulings of the Supreme Court.

In *Lavine v. Milne, supra*, the constitutionality of a New York statute denying Home Relief for 75 days to all individuals who voluntarily left work or lowered their incomes so as to become eligible for the program was challenged on Due Process and Equal Protection grounds. In operation, the statute created a rebuttable presumption that persons who voluntarily terminated their employment did so for the purpose of qualifying for Home Relief. The presumption could be overcome by the applicant at a state fair hearing; unfortunately, under the applicable regulations, such an administrative finding need not be handed down until a time subsequent to the expiration of the 75 day period, and thus, applicants had, in effect, no meaningful opportunity to rebut the presumption.

Despite the likelihood that an applicant could be wrongfully deprived of benefits due to delays in the necessary adjudication, the Supreme Court unanimously held that the scheme was not violative of Fourteenth Amendment rights:

" . . . [T]he State's procedure in ascertaining the applicant's purpose in quitting his job is no different from its procedure in determining any of the other substantive requirements for eligibility. An applicant visits the local agency, is informed of the eligibility criteria, and in response to questions posited by the local official is afforded an opportunity to demonstrate his eligibility. . . . Certainly nothing in the Constitution requires that benefits be initiated prior to the determination of an applicant's qualifications at an adjudicatory hearing." 424 U.S. at 586, 96 S.Ct. at 1016.

The same may be said of the instant requirement: the fact that it may entail a deprivation of benefits pending Family Court adjudication, due to court congestion or for other reasons wholly beyond the individual's control, does not render the statute irrational.[2]

Plaintiffs attempt to distinguish *Lavine v. Milne, supra*, on the grounds that

---

2. Plaintiffs stress that individuals whose Family Court dispositions are delayed for reasons

beyond their control are "innocent"; and posit, from that innocence, a lack of statutory ration-

the Home Relief applicants in that case had voluntarily committed certain acts (i. e. terminated their own employment or lowered their wages) and could therefore be charged with the burden of proving that they had taken these steps for reasons other than to qualify for welfare benefits. Since the failure to obtain proof of a final Family Court adjudication may be beyond an individual's control, plaintiffs contend further that § 15 as amended can be consonant with Due Process only if coupled with a provision allowing an applicant or recipient to participate in the program, despite his lack of the needed court order, upon a showing that all pre-existing criteria are met, a support petition has been filed and diligently prosecuted, and that the failure to timely obtain the disposition is due to no fault on the part of the applicant/recipient.

■ Such reasoning is contrary to recent Supreme Court decisions allowing state and federal welfare agencies to dispense with individualized determinations and to regulate eligibility through objective tests, or with the aid of rationally based presumptions. For example, plaintiffs in *Weinberger v. Salfi, supra*, challenged the

constitutionality of a section of the Social Security Act which denied widow's benefits to surviving spouses who had been married to the decedent for less than nine months prior to the date of death. In operation, the statute created an irrebuttable presumption that individuals who had been wedded to an insured for less than nine months prior to his death had married for the illicit purpose of securing his Social Security benefits, and were therefore deemed ineligible. It was urged that the provision violated plaintiffs' rights under the Fifth Amendment in that it created an irrational distinction between widows.[3]

The Supreme Court rejected the claim, stating:

" . . . [T]he question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions, and would be directly contrary to our holding in *Mourning, supra.* [*Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973)] Nor is the ques-

---

ality. Considerable reliance is placed upon *Davis v. Weir*, 497 F.2d 139 (5th Cir. 1974), in which the Fifth Circuit struck down a municipal water company's policy of requiring that all prior bills at an address be paid before beginning new service at the same address, even at the behest of a newly arrived and "innocent" tenant. The Fifth Circuit held that requiring a new tenant to be financially responsible for water service provided under a prior contract to a former tenant was "an irrational, unreasonable and quite irrelevant basis upon which to distinguish between otherwise eligible applicants for water service," 497 F.2d at p. 145. The decisive factor is the *rationality* of the statute, not the "innocence" of those affected by it. The municipal policy in *Davis* was clearly irrational. We reach a different conclusion in respect of the statute at bar.

3. As indicated *supra*, standards of substantive rationality are approximately the same for both Equal Protection and Due Process purposes:
"[T]he concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' and, therefore, we

do not imply that the two are always interchangeable phrases. But, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process." *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) (footnote omitted).
See also *Examining Board of Engineers, Architects and Surveyors v. Otero*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); *Schneider v. Rusk*, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964).
Moreover, a statute which passes the reasonableness test as applied to the federal government under the Fifth Amendment will perforce suffice as applied to the states under the Fourteenth Amendment, *Richardson v. Belcher*, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). See also *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) and *Silbowitz v. Secretary of Health, Education and Welfare*, 397 F.Supp. 862, 865 (S.D.Fla.1975) ("Equal protection claims under the Fifth Amendment are decided in the same way that Fourteenth Amendment equal protection claims are resolved").

tion whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than nonmembers. The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule. We conclude that the duration-of-relationship test meets this constitutional standard." 422 U.S. at 777, 95 S.Ct. at 2472.

More recently, the Supreme Court in *Massachusetts Board of Retirement v. Murgia, supra,* upheld against constitutional attack a Massachusetts statute requiring state police officers to retire at age 50. Overturning the holding of a three judge court that the law lacked "a rational basis in furthering any substantial state interest", *Murgia v. Massachusetts Board of Retirement,* 376 F.Supp. 753, 754 (D.Mass. 1974), the Supreme Court in a per curiam decision noted:

> "That the State chooses not to determine fitness more precisely through individualized testing after age 50 is not to say that the objective of assuring physical fitness is not rationally furthered by a maximum age limitation. It is only to say that with regard to the interest of all concerned, the State perhaps has not chosen the best means to accomplish this purpose. But where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.' *Dandridge v. Williams,* [citation and footnote omitted]." —— U.S. at ——, 96 S.Ct. at 2568.

See also *Mathews v. Lucas, supra,* (permitting use of objective criteria in determining

whether illegitimate children were in fact dependent upon decedent covered by the Social Security program); and *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), (validating as substantively rational a requirement that aliens be admitted to the United States for permanent residence *and* have actually lived in this country for a period of five years in order to qualify for federal supplemental medical insurance).

 Plaintiffs seek to couch their argument in terms of procedural Due Process as well: in essence, they contend that whatever hearing recipients [4] may be entitled to prior to termination of benefits will be meaningless because under State law, the administrative officer is not empowered to recertify an individual upon a showing that the support petition was seasonably filed and diligently pursued, though no Family Court order has yet been issued. By this argument, plaintiffs attempt to bring the statute within the rubric of *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

The effort fails because the rationale of that case is inapposite to the immediate situation. *Goldberg* and its progeny require that a hearing be afforded a welfare recipient prior to a disruption of his benefits, where the termination of those benefits is due to a unilateral, factual finding by the administering body that the individual is no longer eligible. A pre-suspension hearing is necessary to meet procedural Due Process standards because the recipient is deemed to have a protectible property interest in continued receipt of his benefits, which would be jeopardized by a mistaken factual conclusion reached without the opportunity for the recipient to respond.

 No such problem arises in the instant context; the only finding of fact bearing on the individual's continued receipt of Home Relief is the question of whether or not the Family Court order has

---

4. This argument is unavailable to applicants since under State law their expectation of receiving Home Relief benefits does not constitute a protected property interest. Cf. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

been obtained. This is an objective condition of eligibility, and compliance with it need not be determined on a case by case basis. While it is true that a hearing in such circumstances would be an empty exercise, it is equally true that the Legislature may review its ongoing social welfare programs and redraft the criteria of eligibility therefor. The fact that the new requirements are inflexible and that some recipients, through no fault of their own, may not be able to satisfy them without an interruption of their benefits does not render the legislation invalid on procedural Due Process grounds. See e. g., *Lavine v. Milne, supra.*

In light of the holdings of the above cases, this court is compelled to conclude that the requirement that applicants/recipients obtain a Family Court order before receiving or continuing to receive Home Relief is rationally related to the statute's objective of ridding the welfare rolls of ineligibles and thereby conforms to the dictates of Due Process.

## V.

### Equal Protection

Despite this court's finding of substantive rationality, plaintiffs may nonetheless prevail under their Equal Protection theory if they can substantiate their claim that § 15 as amended creates an invidious discrimination between two groups which are otherwise similarly situated. Plaintiffs postulate that the objectionable "classification" consists of the distinction drawn between those individuals who procure the Family Court order and those who do not. Since each class is equally destitute and deserving, and the only basis for their dissimilar treatment lies in the fortuity of receiving a timely adjudication, the statute is averred to contravene the Equal Protection clause.

■ This argument fails at the outset since plaintiffs have not formulated a "classification" within the meaning of the Fourteenth Amendment. The instant statute does not by its terms distinguish between prospective participants in the Home Relief

program; it merely sets forth an objective criterion of eligibility which, when complied with, leads to a different result than when it is not.

Under these circumstances, the Supreme Court has held that statutes such as amended § 15 do not create "classes" within the purview of the Equal Protection clause. In *Weinberger v. Salfi, supra,* plaintiffs asserted that a federal statute defining widows for purposes of receiving Social Security benefits, as individuals married to an insured decedent for more than nine months, established a distinction between surviving spouses prohibited by the Fifth Amendment. The Supreme Court rejected such a formulation of classes because its acceptance would clothe all persons failing to comply with rationally based, objective criteria of eligibility with a colorable claim under the Equal Protection clause. Mr. Justice Rehnquist analogized the inability of a surviving spouse to prove the requisite duration-of-relationship to the failure to meet any other condition of receiving benefits, including the mere technical requirement that beneficiaries timely file their claims:

"... [T]he very section of Title 42 which authorizes an action such as this, § 405(g), requires that a claim be filed within 60 days after administrative remedies are exhausted. It is indisputable that this requirement places people who file their claims more than 60 days after exhaustion in a different 'class' from people who file their claims within the time limit. If we were to follow the District Court's analysis, we would first try to ascertain the congressional 'purpose' behind the provision, and probably would conclude that it was to prevent stale claims from being asserted in court. We would then turn to the questions of whether such a flat cutoff provision was necessary to protect the Secretary from stale claims, whether it would be possible to make individualized determinations as to any prejudice suffered by the Secretary as the result of an untimely filing, and whether or not an individualized

hearing on that issue should be required in each case. This would represent a degree of judicial involvement in the legislative function which we have eschewed except in the most unusual circumstances, and which is quite unlike the judicial role mandated by *Dandridge, Belcher,* and *Nestor,* as well as by a host of cases arising from legislative efforts to regulate private business enterprises." 422 U.S. at 772–773, 95 S.Ct. [2457] at 2470.

The statute at issue here is far more neutral on its face, and significantly freer from establishing impermissible classes than the "objective" provision upheld in *Weinberger v. Salfi, supra,* and consequently, plaintiffs Equal Protection challenge must be denied.

. ▮ To the extent that § 15 as amended creates any distinction between classes, it arises solely as the result of disparities in waiting time experienced by petitioners residing in counties of this State where there is little Family Court congestion, as opposed to those who reside in the districts, largely urban, where the court dockets are overburdened. This dissimilarity, however regrettable, does not rise to the level of a constitutional deprivation of Equal Protection.

As a general principle, it cannot be doubted that a state or local legislature may adopt economic regulations without violating the Equal Protection clause where such laws impact in different degrees upon individuals residing in different geographic areas. In *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), plaintiffs contended that Texas' method of school financing violated the Equal Protection guarantee of the Fourteenth Amendment because it depended, in part, upon a system of local taxation which led to greater appropriations to schools in "wealthier" districts. The argument was repudiated because "the existence of 'some inequality' in the manner in which the State's rationale is achieved is not alone a sufficient basis for striking down the entire system . . .", 411 U.S. at 50, 93 S.Ct. at 1305. Mr. Justice Powell stated further:

"Appellees further urge that the Texas system is unconstitutionally arbitrary because it allows the availability of local taxable resources to turn on 'happenstance.' They see no justification for a system that allows, as they contend, the quality of education to fluctuate on the basis of the fortuitous positioning of the boundary lines of political subdivisions and the location of valuable commercial and industrial property. But any scheme of local taxation—indeed the very existence of identifiable local governmental units—requires the establishment of jurisdictional boundaries that are inevitably arbitrary. It is equally inevitable that some localities are going to be blessed with more taxable assets than others [footnote omitted]. . . .

". . . [I]t has simply never been within the constitutional prerogative of this Court to nullify state-wide measures for financing public services merely because the burdens or benefits thereof fall unevenly depending upon the relative wealth of the political subdivisions in which citizens live." 411 U.S. at 53–54, 93 S.Ct. at 1307.

Perhaps more to the point, it has been repeatedly and explicitly held that no violation of Equal Protection occurs where civil litigants in certain counties of this state receive more expeditious treatment than residents of other counties. In *New York State Ass'n of Trial Lawyers v. Rockefeller,* 267 F.Supp. 148 (S.D.N.Y.1967) four named plaintiffs, prosecutors of personal injury suits in the State courts, sought declaratory and injunctive relief against the State officials responsible for the allegedly unfair distribution of judgeships which resulted in undue delays in certain urban jurisdictions, claiming such administration of the judicial system violated their Equal Protection rights. Judge Tenney rejected the claim, finding that it did not even raise a substantial federal question requiring the impaneling of a three judge court:

"In this case, plaintiffs' entire claim rests on the assumption that there is a federally protected right to have state court

judges apportioned among judicial districts and counties in such manner as to prevent any greater delay in the adjudication of cases in one area or political subdivision of the state than another. Not only is there a total absence of authority for the existence of any such right, but the assumption upon which it rests is directly contrary to basic principles of federalism and separation of powers." 267 F.Supp. at 151.

In *Kail v. Rockefeller,* 275 F.Supp. 937 (E.D.N.Y.1967), (three judge court), the court rejected the contention, advanced by litigants in Queens County Supreme Court, that they were denied Equal Protection by the undue delays they encountered in that county:

> "Plaintiffs claim that they are denied the equal protection of the law under the Fourteenth Amendment by reason of the lack of judges arising from an unequal population apportionment which in turn causes a delay in the trial of their cases far greater than and unequal to the delay in other judicial districts. A uniform timetable for the trial of all cases within the State is not required by the Fourteenth Amendment. In applying the guarantee of equal protection of the law, the Constitution does not demand that the law operate in the same manner upon all persons within the State (*McGowan v. State of Maryland,* 1961, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393) nor does it mandate territorial uniformity (*Griffin v. County School Board of Prince Edward County,* 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256)." 275 F.Supp. at 942.

See also *DeKosenko v. State of New York,* 311 F.Supp. 126 (S.D.N.Y.1969), *aff'd,* 427 F.2d 351 (2d Cir. 1970); *Buchanen v. Rhodes,* 249 F.Supp. 860 (N.D.Ohio), *app. dism'd,* 385 U.S. 3, 87 S.Ct. 33, 17 L.Ed.2d 3 (1966).

Finally, plaintiffs in their sur reply memorandum attempt to forge an Equal Protection argument on the dissimilar treatment accorded persons whose legally responsible relative(s) are deceased or receiving public assistance and all other Home Relief applicants/recipients. As to the former "class", plaintiffs note that the requirement of receiving the Family Court order may be waived, but no such opportunity is given the latter "class". Cf. *Jimenez v. Weinberger,* 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) (Discrimination between classes of illegitimates voided as violative of Fifth Amendment Due Process.). Suffice it to say that the distinction, apparently created by administrative interpretation of § 15 as amended is rationally based since it is patently obvious that deceased individuals or persons receiving welfare themselves are not likely to be able to support their dependents.

We conclude, therefore, that the operation of the statute does not create an invidious or arbitrary distinction between classes within the meaning of the Equal Protection clause of the Fourteenth Amendment.

### Conclusion

We recognize that the operation of this amendment to the New York Social Services Law may result in hardship to needy individuals which they are powerless to prevent. We further recognize that such hardship, where it occurs, arises from the failure of the State of New York to provide adequate Family Court facilities in some of the several counties of the State.[5] It is equally clear that the New York State Legislature, had it chosen to do so, could have drafted the statute in such a manner as to avoid this particular hardship.

Notwithstanding these factors, we are compelled, in the light of the governing

---

5. As to those counties, defendant Toia says in his brief (p. 6) that the statute in question "must be read as an order to the Family Court to expedite dispositions of support petitions the same way that the New York Criminal Procedure Law § 30.30 is a direction to the courts to provide speedy trials within a specific period of time." This court may be permitted to express the hope that this is not just an exercise of advocate's rhetoric; and that, in cases of hardship arising out of the statute, the Family Courts in question will act in accordance with defendant Toia's view.

authorities discussed above, to conclude that the constitutional attack upon the statute must fail.

That determination having been reached, we need not pass upon the motion for class certification.

The temporary restraining order is vacated, the motion for permanent injunction is denied, and the complaint is dismissed.

It is So Ordered.