Bertram Harnett, J.
Our poverty stricken aged, blind, and disabled, asking for their next welfare check as their financial breath, hear in horror each of the giant bureaucracies of the county, State, and Nation blithely reply, “ who, me? ” Unfortunately, this current version of a great American game falls with harsh impact on a most vulnerable segment of our society. In the language of legal precincts, it is Exhibit A in the mindless absorption of human beings into computerized oblivion.
No one disputes that these people are entitled to their money. The only question is who pays and when. But, this is vital, because without their subsistence allowances in hand, these *678 people cannot pay for today’s food and shelter. These are not commercial concerns maintaining lines of credit, or persons with resources to fall hack upon; these are unfortunate citizens who hy social principle and administrative determination have demonstrably immediate need for that next dollar.
The mess arose in January, 1974 with a new changeover in the Aid to the Aged, Blind, and Disabled program (AABD). "Where previously the States made the assistance grants in the first instance, now the Federal Government has assumed that responsibility. In the course of what is undeniably a massive administrative task, apparently large numbers of recipients failed to receive any January or February checks, or in many other instances, received sums significantly below their true entitlement. Whether this results from machine or programming inadequacy, improper input data, lack of intergovernmental co-operation, blown fuses, or files dropped between cabinets, the drastic facts remain that either no payment or underpayments have resulted on a large scale. These people need, want, and ask for their entitlement from someplace.
This has not seemed to faze the Federal mechanics. Although the Federal Government did not appear in this case, we gather the Federal position is purely one of patience — someone else’s patience to be sure — the matter will be corrected in due time. The State and the county, on the other hand, sympathize, but urge that the Federal Government has taken over and should pay. They also worry that if they make payments they will not be reimbursed by the Federal Government, and they are fearful the recipients will get double payments when the Federal computers finally crank out the proper checks.
In the meantime, what about the people? We refer not to a number on the file, or to a place on a magnetic tape, but to the flesh and blood citizen whose eating and being are staked out on the imminency of assistance. If the bureaucrats are all correct, these people can get no relief, except that portended by the lapse of time and beneficent Federal intention.
One thing is very plain to this court. The needy aged, blind, and disabled must receive assistance from someplace. No matter the genius employed to rationalize statutes, administrative schema, and public fiscal policy, the people and their problem simply do not go away. At the time of submission of the original pleadings of this case, with the county’s co-operation, we directed interim continuance of payment by the county to AABD recipients who did not receive their full entitlements, until our conclusion could be reached. In this way, the people *679 were protected during the legal disputation.
Now that we have had an opportunity to review the pleadings, oral argument, and memoranda of law, we will direct that the State and the county continue the monthly provision of December, 1973 for all persons adversely affected by the changeover. We find that the .State (and the county, its local agency) has residual responsibility.
New York has a number of possible alternatives, other than blanket denial of its duty of care, that will protect its legitimate fiscal concerns. If the State is concerned about duplicate payment, it can protect itself under existing provision allowing legal procedure against social service recipients where assets (in this case, one of the double payments) are located.[1] Indeed, it may condition its payment on assignment by the recipient of his claim to any duplicate benefit from the Federal Government. Immediate interagency communications may be established so that a due-but-late Federal check can be intercepted and stopped after a State grant has been issued (¡with later negotiation between the government bodies as to which one is to bear the ultimate burden for such moneys expended). Moreover, the State might treat with the Federal Government to solve the problem politically, administratively, or legislatively.[2] The people here cannot be put to the burden of suing the Federal Government in yet another forum. If there is more judicial recourse indicated, let those better equipped pursue it. At the bottom, the possibility of avoidable governmental mistake is no reason to let the afflicted become more afflicted.
Simple humanity and common sense require these results. Yet, the case offers a veritable panoply of technical points through which the court and counsel have picked their way. For the record, the court will indicate summarily its thoughts on the principal legal points raised.
Parenthetically, the court must observe the effective representation of the petitioners here by the Nassau County Law Services Committee, a neighborhood law office project. The class here would have been helpless to dispute the manifest injustice posed without such assistance. In a time when social legal services are subject to much (and some deserved) criti *680 cism, it is heartening to see such a concrete example of good work and inherent systemic justification.
1. ADDED- PARTIES
Four new people have requested leave to intervene as petitioners in addition to the three originally named. They are disabled, blind, or elderly persons whose January, 1974 Federal grants were drastically reduced below the amounts received from the county in December, 1973. Since no one disputes their need, nor opposes the requested intervention, it is granted. (CPLR 1013.)
2. CLASS ACTION AND- DECLARATORY RELIEF
The essence of this article 78 proceeding is to declare the rights of[1] the parties. It is to determine what State and local responsibility lies after January 1, 1974 for the care of persons who were receiving AABD benefits in Nassau County in December, 1973. The blanket State and local departmental denial of responsibility establishes a common policy affecting all members of the class, without need for individuation.
This proceeding -may be treated as a declaratory judgment and class action pursuant to CPLR 103 (subd. [e]), 1005, and 3001 (Young v. Shuart, 67 Misc 2d 689, mod. 39 A D 2d 724; Matter of Cisco v. Lavine, 72 Misc 2d 1009). The avoidance of multiple lawsuits raising the same issue, and the need for clarification of the various relationships involved in the new assistance programs, commend this course. Moreover, the controversy involves no real factual disputation.
3. ABSENCE OF FEDERAL AGENCY
The State seeks to dismiss this proceeding for lack of a necessary party, the Social .Security Administration, the Federal agency in charge of administering the new program. The primary issue here — the responsibilities of State and local authorities to their own residents under residual State law, if any, — can be effectively determined by the parties before the court and complete relief accorded, regardless of any additional Federal responsibilities which may exist. (2 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 1001.05.) The Federal agency is not a necessary party to the State law resolution. In any event, the Federal agency could not likely be joined without its consent.
The-court will, therefore, exercise its discretion under CPLR 1001 (subd. [b]) and proceed to the merits of the State law controversy.
*681 However, there is one separate claim stated which is not passed upon here, because it does necessarily involve the Federal Government. Petitioners contend that, under the doctrine of Goldberg v. Kelly (397 U. S. 254 [1970]), the due process clause of the Fourteenth Amendment to the United 'States Constitution required that prior notice and opportunity to be heard be afforded before any regular assistance entitlements were reduced in the January, 1974 Federal changeover. It does not appear that State prior notice and hearing procedures (18 NYCRR Part 358) apply independently to reductions in monthly entitlements that are now provided in the first instance by the Social Security Administration under Federal law. Regardless, this issue of prior notice directly and substantially affects the Social Security Administration, since its determination must include an examination and evaluation of Federal procedures for grant issuance and for hearing grievances concerning denial or reduction of the recurring Federal grant. The court cannot and does not decide this point without having the Federal agency joined as a party. (Cf. China Sugar Refining Co. v. Anderson, 6 Misc 2d 184.)
4. BACKGROUND OF THE NEW PROGRAM
Subchapter XVI of the Social Security Act (U. S. Code, tit. 42, § 1381 et seq.), entitled “Supplemental Security Income for the Aged, Blind and Disabled” (SSI), became effective January 1, 1974. This legislation dramatically altered the previous governmental responsibilities for providing public assistance to the aged, blind, and disabled. Yet, some fundamentals of the previous social services system were not changed at all.
a. PRE-JANUARY 1974: STATE-SPONSORED, FEDERALLY-REIMBURSED AABD PROGRAM
Prior to the Social Security Act of 1935, aid to the needy was provided, if at all, in patchwork manner by localities under so-called Poor Laws. The Federal legislation set up a new structure designed to unify the disparate programs, and established, among its several programs, Aid to the Aged, Blind and Disabled (AABD).[3]
*682 Substantial Federal reimbursement was made available under the Act to any State with a “ plan” for providing assistance to the aged, ¡blind, or disabled. While certain minimum Federal requirements had to be met in order to obtain the promised Federal reimbursement,[4] the programs were legislated, administered, and operated entirely by State and local social services agencies.
The monthly grants were issued by the State at levels established by the State, and later, upon proper authentication, Federal reimbursement was forthcoming for payments made. The fundamental responsibility for providing aid to the needy was, then, solidly placed upon State and local administrative shoulders.[5]
•b. FROM AABD TO SSI
For some time, controversy raged over the great differences in levels of aid granted by the various 50 States, and their respective subdivisions, under the traditional State-operated, Federally-reimbursed public assistance system. The SSI program emerged as a step towards making aid levels more even and equitable throughout the country.[6]
The basic requirements of the new program are set forth in the United States Code (U. S. Code, tit. 42, § 1601 et seq.; P. L. 92-603, U. S. Code Cong. & Admin. News 1972, vol. 1, p. 1715 et seq.). In brief, these amendments to the Social Security Act establish a wholly Federal “floor” of annual assistance per aged, blind, or disabled person. This basic grant is to be issued in monthly installments by the regional Social Security Administration offices in each State.
The new SSI provisions go even further, to avoid causing a reduction of aid to persons in States like New York which had a pre-1974 level of assistance that was higher than the SSI floor. The statute allows for State supplementation of the uniform Federal grant so that recipients in that State would receive that difference.[7] The State itself may pay this supplement, separately, or as New York has done, by agreement dated *683 November 30,1973, opt for an agreement with the United States Department of Health, Education and Welfare, the parent agency of the Social Security Administration. Under such an agreement, the Federal agency provides the supplementation as a part of the boosted monthly SSI grant, and later receives reimbursement by the State for those additional moneys expended.
Finally, in 1973, Congress required that the prior level and standard of State-derived AABD assistance paid to an individual in December, 1973, be maintained after January 1, 1974, in the new SSI program.[8] By agency vernacular, then, prior AABD recipients were ‘ ‘ grandfathered ” in at past State levels.
e. new York’s dovetail to ssi
New York enacted legislation in 1973 designed to coincide with the new Federal statute. (See L. 1973, ch. 516.)
Subdivision 8 of section 131-a of the Social Services Law now indicates that the over-all SSI grant, including the supplementation opted for by New York’s agreement with HEW, is substituted for previous recurring State AABD allowances. Subdivision 8 of section 131-a and section 153 of the Social Services Law provide for social services district and State reimbursement responsibilities for any supplemental payments made under the New York-HEW contract.
Significantly subdivision 10 of section 131-a of the Social Services Law gives the State Social Services Department discretion to promulgate regulations “ to provide for the needs of aged, blind or disabled persons, whose needs are not met by federal supplemental security income and/or additional state payments ”. (Emphasis supplied.)
5. RESIDUAL NEW YORK LOCAL DUTY OF CARE; NO ABSOLUTE FEDERAL PRE-EMPTION
Because of its own law, manifesting its community conscience, New York has the residual duty to take care of its needy for whom all other provision has failed. The new SSI legislation and its concomitant Social Services Law amendments do not eradicate this pre-existing basic duty of care.
The New York State Constitution, unchanged by SSI, unmistakably declares the paramount State concern for the needy in section 1 of article XVII, entitled, “ Social Welfare”: “The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and *684 in such manner and by such means, as the legislature may from time to time determine
• The Social Services Law in turn still divides the State into local social services districts, such as Nassau County, with supervisory umbrella authority retained by the State Social Services Department. Pursuant to section 62 of the SociaL Services Law: “ Bach public welfare district shall be responsible for the assistance and care of any person who resides or is found in its territory and who is in need of public assistance and care which he is unable to provide for himself ”.
These broad and unqualified mandates have been repeatedly found to impose a duty upon localities to meet urgent and basic needs of their indigent residents. (Matter of Thomas v. Sipprell, 69 Misc 2d 87; Matter of Ross v. Barbaro, 61 Misc 2d 147; Matter of Lawson v. Shuart, 67 Misc 2d 98.) Although provision was made in 1973 State legislation for the SSI takeover of recurrent needs of aged, blind, and disabled New Yorkers previously met by State disbursement, the basic duty of care, as imposed by the Constitution and section 62 of the Social Services Law, remained in the State and local agencies. And, in specific terms, there is still remaining State responsibility for special need grants, social services, and medical assistance to the aged, blind, and disabled.[9] The Federal responsibility is “primary”, but it is not exclusive.
There is no language in either the Federal or State SSI-related legislation that requires or indeed suggests a total preemption of State and local responsibility by the Federal Government. Pre-emption by the Federal Government of a function traditionally accorded to the States will not be inferred in the absence of an express provision or manifest intention to preclude State participation. (Schwartz v. Texas, 344 U. S. 199, 202-203 [1952]; New York, State Dept. of Social Servs. v. Dublino, 413 U. S. 405, 414 [1973].)
6. THE STATE’S BUBDEH
Subdivision 10 of section 131-a of the Social Services Law specifically authorizes departmental provision to meet the needs *685 of AABD persons “ whose needs are not met ” by the SSI program. Since there is no stated limitation upon this residual assistance, this statute appears to cover this type of emergency where SSI has failed to meet the urgent needs of aged, blind, and disabled persons. It is the residual channel of aid, where all others break down, that fulfills the State’s obligations under its Constitution and subdivision 1 of section 62 of the Social Services Law.
Under the governing statutes, the State has a duty in emergency or interim situations where its own AABD residents, through absolutely no fault of their own, fail to receive assistance and become destitute. Patently, under the Constitution and Social Services Law, the State cannot let people starve or be evicted from their shelter in winter.
Indeed, Home Belief Assistance, the general catchall category for those unable to receive aid from any other sources, would logically be available to these persons under subdivision (a) of section 158 of the Social Services Law if AABD aid failed.
The State has promulgated 18 NYCBB Part 397 entitled ‘£ Emergency Assistance For Adults ’ ’ which recognizes the existence of State residual responsibility. But for some reason it lists only five exclusive categories, the one arguably applicable here being limited to provision of “ essential clothing, furniture, food, shelter and/or fuel lost as a result of a fire, flood or other similar catastrophe which could not have been foreseen by the applicant, was not under his control and is not the result of lost cash, or chhcks which have been lost or stolen” (18 NYCBB 397.1 [b] [1]). Incidentally, all of these categories assume the recipient has in fact received his full entitlement which was then consumed in catastrophe. All the State regulatory categories are “ extras ”, and do not take into account massive failure to disburse in the first place. In any event, no limitation of natural catastrophe is written into¡ the statute. The regulation may not limit eligibility categories in derogation of the statute. It would be unconscionable for it to bar fulfillment of the State’s statutory obligation to care for the AABD needy in this circumstance, which is urgent and fortuitous, though resulting from a bureaucratic rather than natural disaster.
In the AFDC program, the State has already lost an analogous battle. When it has tried by regulation to limit the emergency assistance available to families with children under section 350-j of the Social Services Law to natural catastrophe, *686 the courts have uniformly held otherwise and directed emergency aid, whenever destitution is threatened, in compliance with the statute. (Matter of Nazario v. New York City Comr. of Social Services, 32 A D 2d 630; Matter of Hatfield v. Lavine, 42 A D 2d 855; Young v. Shuart, 67 Misc 2d 689, mod. 39 A D 2d 724, supra.) In the AABD program, the State can be no more successful in turning its back on need by artificial categorized limitation of emergency circumstance.
The only present Federal provision to meet emergencies under the SSI plan is contained in section 1631 (subd. [a], par. [4], cl. [A.]) of title 42 of the United States Codé. The Secretary of HEW is authorized to make emergency cash advances not exceeding $100 to presumptively eligible recipients. However, there is no provision which bars State-sponsored emergency aid, so the availability of the $100 Federal “ advance ” does not relieve the local agencies of their duty to care for the destitute and needy in extremis. It is within the boundaries of the local agency that the special need arises. Here is the ultimate nondelegable inescapable duty — at home.
The monetary extent of the State and Federal responsibility depends upon the circumstances of need and urgency presented in each instance, but has as its presumptive scale the level of AABD assistance accorded prior to the changeover. It is this amount of monthly assistance, including food stamp bonus value, which the State has already declared minimally required to meet basic needs for food, shelter, clothing, and other living incidentals. (See Social Services Law, § 131-a.) Provision of any amount less than previously issued would drag the grantee below those minimum standards and would, therefore, not be compliance with the local duty to care for the AABD needy.
The State and local duty to provide emergency care may not be automatically invoked if an isolated SSI check simply does not arrive at the first of the month. It is only after a reasonable effort has been made at the Social Security Administration office to secure due payment, and the effort has proved unsuccessful, that the residual responsibility arises. Here, a widespread administrative breakdown is coneededly in conspicuous being.
7. THE 1 ‘ REIMBURSEMENT ’ ’ HASSLE
The State and local agencies fear their emergency payments will fail to elicit Federal reimbursement. But, the battle over ultimate agential financial burden and formulae of reimbursement may progress on another front, and cannot be used as a, *687 basis for denying aid so urgently needed. (Matter of Ross v. Barbaro, 61 Misc 2d 147, supra.)
8. JUDGMENT IS THEREFORE GRANTED:
(1) amending the caption to include the names of the added intervening petitioners, and their affidavits shall be deemed incorporated into the verified petition.
(2) declaring this proceeding is a proper declaratory and class action brought on behalf of all recipients of AABD assistance in Nassau County in December, 1973 whose SSI grants in January, 1974 were reduced below their prior entitlements.
(3) declaring the Federal supplemental security income program does not pre-empt State and local social services responsibility for ultimate care of the needy aged, blind, and disabled recipients;
(4) declaring that the local agencies must meet the special needs of their prior AABD residents not met by SSI;
(5) declaring that the Social Security Administration is a necessary party to a determination of the sufficiency of notice and hearing procedures concerning reduction in AABD-SSI entitlements after January 1, 1974, and the portion of the petition raising this issue is dismissed, without prejudice to its renewal upon proper party joinder.
(6) directing the Nassau County Department of Social Services to provide assistance to prior AABD recipients who suffer destitution as a result of their grant being reduced below the level of entitlement mandated by December, 1973 standards.
Submit judgment on notice.

. See 18 NYCRR. 352.23 and 352.31 (d); Muniz v. Lavine, 75 Misc 2d 426; cf. 42 U. S. C. § 1631 (b).

. The Federal legislation now allows for Federal and State authorities to work out adjustments and allocations for grants erroneously made. (See U. S. Code, tit. 42, § 402; agreement between New York State and the United States Department of Health, Education and Welfare dated November 30, 1973, arts. VI and IX.)

. Section 1381 et seq. of title 42 of the United States Code contains applicable provisions for the AABD program which was essentially a composite of three co-extensive Federal programs: Old Age Assistance (U. S. Code, tit. 42, § 301 et seq.), Aid to the Blind (U. S. Code, tit. 42, § 1201 et seq.), and Aid to the Permanently and Totally Disabled (U. S. Code, tit. 42, § 1351 et seq.) see Altmeyer, Formative Tears of Social Security (1966). For simplicity, we refer to all such programs as “ AABD ”.

. King v. Smith, 392 U. S. 309 (1968); Rosado v. Wyman, 397 U. S. 397 (1970); Matter of Cisco. v. Lavine, 72 Misc 2d 1009, supra.

. See, infra, Point 5.

. See, e.g., J. L. Maskaw, “Welfare Reform and Local Administration of Aid to families witli Dependent Ckildren in Virginia,” 57 Va. L. Rev. 818 (June, 1971). Tke legislative kistory of SSI sets fortk its objectives and is found at TJ. S. Code Cong. & Admin. News 1972, vol. 3, p. 4989 et seq.; see 1972 Social Security Amendments-Supplemental Security Income for tke Aged, Blind and Disabled, 58 Cornell L. Rev. 803 (August, 1973).

. Social Security Arndts, of 1972, § 1616; P. L. 92-603, U. S. Code Cong. & Admin. News 1972, vol. 1, p. 1725.

. Social Security Arndts, of 1973, § 212 et seq.; P. L. 93-66, TF. S. Code Cong. & Admin. News 1973, vol. 1, p. 174.

. Social Services Law, §§ 208, 250, 301 et seq. Indeed, the leeway of § 13Ua, suhd. 10’s provision for special need provision by the State beyond SSI was described in the legislative memorandum in support of the State companion SSI legislation, attached as Exhibit “ C ” to respondent Lavine’s answer herein, as enabling “the Department to prevent harmful effects on needy individuals which could result from the major changes being made in the AABD program * “ " examples are the payment of a person’s rent while he is in a hospital, moving expenses and unforeseeable emergency needs ”. (Emphasis supplied.)