Bertram Harnett, J.
Marie Zanelli brings this article 78 proceeding in behalf of herself and her son Angelo. It is to annul the New York State Department of Social Services decision after a “ fair hearing ” dated June 28, 1978, which affirmed the County Social Services determination discontinuing food stamps because of excess income.[1]
Mrs. Zanelli lives with her son in a Franklin Square home she owns. She is 76 years of age and is guardian for Angelo, age 36, who is afflicted with cerebral palsy. In March, 1973, their-food stamp allotment was discontinued. At that time, their gross monthly income of $320[2] was derived from three sources:
$129 in Social Security income;
$ ,24 in Aid to the Disabled public assistance to Angelo;
$167 in Mrs. Zanelli’s Social Security retirement benefits.
$320 total income.
Pursuant to 18 NYCRR Part 485, food stamp entitlement is computed by subtracting from gross income the allowable itemized deductions, leaving a net figure which must be within certain promulgated limits. That maximum for the Zanelli household of two in March 1973 was $245.
The only permissible subtraction here is for shelter costs. 18 NYCRR 435.5 (a)(5)(vii) provides for the deduction of “ shelter costs” incurred that exceed a “ shelter standard ” of “ 30 percent of the household’s income ”. That regulation also provided: “'Shelter costs shall include heating and cooking fuel, electricity, basic cost for one telephone, water, and sewage disposal. In the case of a household which is buying or owns its home, mortgage payments, interest on mortgage principal, *573 real estate taxes, and special assessments required by State or local law shall be considered to be shelter costs.”
The county allowed as shelter costs the items listed- in the regulation, which in the Zanelli household were given as taxes, water, fuel, telephone and electricity, totaling $134 per month. The 30% “ shelter standard” for monthly income of $320 is $96, leaving then, under the county computation, an excess shelter cost of $38. When this cost is deducted from $320, $282 remains as ‘ ‘ monthly net food stamp income ” which is above the $245 maximum for food stamp entitlement.
The Zanellis claim that their expenses towards household “ maintenance ” and fire and furnace service insurance should be allowed as a part of1 deductible shelter costs, and that the State has arbitrarily limited its regulation to only the items specified in 18 NYGRR 435.5 (a) (5) (vii).
The regulatory language used does not have an exclusive flavor. It does not “ define ” shelter costs, nor does it say what they ‘1 shall be”. It merely states that shelter costs shall include certain items. For homeowners other specified costs shall be considered to be shelter costs. On the other hand, there is no trailing catchall phrase in the regulation that requires or allows inclusion of other omitted, arguably necessary costs of a home. In short, the regulation is ambiguous.
The sponsoring Federal regulation for this food stamp program, derived from the Federal Food Stamp Act of 1964, simply provides for the deduction of excess shelter costs, with no itemization or qualifying words, apparently leaving the scope of this deduction up to each State to determine.[3] In the final analysis, while the underlying purpose of the food stamp legislation— the provision of a food bonus to low income families as an aid in purchasing a ‘4 nutritionally adequate diet ’ ’— should be considered (see U. S. Code, tit. 7, § 2011; Matter of Cherkis v. Impellitteri, 307 N. Y. 132), the implementation of the program must be achieved within the terms prescribed by the State and Federal Governments. (People v. Olah, 300 N. Y. 96.) In determining, then, the scope of deductible shelter costs, the court looks to the sense of the New York regulation.
The court must reject the petitioners’ contention that all shelter-related costs are deductible, since no such all-inclusive language appears in any applicable regulation. Yet, the lan *574 guage used there cannot he absolute in its itemization, because at least one item is not mentioned that all must agree would be included as a deductible shelter cost: rent. In the absence of exclusive terminology, and noting the one clearly included item omitted, the court believes the regulation to be circumscribed by the general meaning of “ shelter costs ” as used in this context. (See Bradley v. Buffalo, N. Y. & Erie R. R. Co., 34 N. Y. 427.) Indeed, the State concedes in its second affirmative defense that reasonable shelter costs are meant to be deductible under the regulation, whose terms we just noted are not exclusive in either language or common sense constraint.
In construing the regulation, we have recourse then to the maxim, noscitur a sooiis, meaning that the words (“ shelter cost ”) used in the regulation shall be interpreted in relation to their associative words and phrases. (Wakefield v. Fargo, 90 N. Y. 213; McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 239, subd. a.) Alternatively stated, the general term employed, and its parameters, are ascertained by reference to the contextual company it keeps. (See Town of Huntington v. Transom, 43 Misc 2d 912.)
Here, we perceive that the cost items specifically mentioned in the regulation have a certain commonality. Bach one — e.g., the mortgage payment, real estate tax, water charge, sewage disposal— entails a certain periodic regularity, a fixed or limited rate, and a noncapital necessary expense appurtenant to the property. (See Matter of Banks v. Wyman, 39 A D 2d 215.) In most respects the costs are self-establishing in amount, or in any event set by some independent entity. Such other charges as share these common elements with the shelter costs specifically mentioned are therefore reasonably included within the regulatory ambit.
The fire insurance premium is an annual cost of household maintenance which has a specific limit, is regularly incurred at an established rate, and is a virtual necessity of responsible home ownership. Like rent, it is an item well within the general area of those itemized in the regulation. It is as “ reasonable ” a shelter cost as can be imagined and often an absolute requirement in mortgage agreements. Fire insurance is practically universal in family-owned homes. While Mrs. Zanelli appears to have paid off her mortgage, the essential nature of fire insurance, even without a mortgagee’s insistence, cannot be disputed. Anomalous indeed would the result be where food stamp eligibility requirements discourage insurance protection against home destruction by fire.
*575 Similarly, the furnace service insurance premium is a regular annual charge set experientially and not subject to uncontrolled or unilateral increase, other than inflation of servicing costs generally. It is a necessary and routine element of heating a home, an accessory expense required for the adequate maintenance and operation of the furnace. Furnace service, like fuel, is a universal aspect of home heating which is inseparable from prudent and reasonable home ownership.
The inclusion as shelter costs of the annual premiums for fire insurance ($162) and the furnace service insurance ($25) yields $150 per month, when combined with the other allowed deductible costs, or $54 above the shelter standard. That leaves $266 in net food stamp income. This amount is still above the $245 maximum prescribed by the regulation in March, 1973, as well as the máximum of $260 now prescribed by a revised State directive dated December 4,1973.[4] (Transmittal of N. Y. State Dept. of Social iServs., 73 M. B. 72, Bull. 154.)
Therefore, the remaining cost item of home “ maintenance,” claimed to be $300 per year, must be deductible in order for the Zanellis to prevail. This item is not defined or even described in the papers submitted. It would, appear to include the ordinary replacement and repair of fixtures around the house.
Such repair is outside the contemplated scope of items named in 18 NYCRR 435.5 (a) (5) (vii) as shelter costs. It has no defined limit or established rate, unlike those items regulatorily. specified. Indeed, it is an open-ended expense item with great leeway, depending often upon the amount a person chooses to spend upon house maintenance, and, of that, how much was necessary. The record here is illustrative: it is bereft of any breakdown of the $300 annual “ maintenance ” figure. No itemization or verifying data were supplied at the fair hearing or in the petition.
Even conceding urgent repair necessity, 18 NYCRR 435.5 (a) (5) (iv), (f) cautions against allowing this type of deduction *576 in food stamp income computation, by stating: 11 Under no circumstances shall deductions from income be made for ‘ hardships ’ except as provided in this section * * * deductions under this provision [for ‘ unusual expenses due to an individual household's disaster or casualty losses ’] will not be made for costs of repair or replacement of property * * * which ¡becomes necessary due to mechanical failure, wear and tear, obsolescence, or any other occurrence not directly connected with an individual household disaster There is no demonstrated implication in the Federal regulation or the general ■State statutory authorization for the food stamp program, section 95 of the Social Services Law, that repairs or maintenance are included in shelter costs. The court finds reasonable the State’s determination not to consider ordinary household repairs in computing regular food stamp eligibility. (Matter of Howard v. Wyman, 28 N Y 2d 434.) The line drawn to exclude repair from ordinary eligibility criteria is not then irrational. (Cf. United States Dept. of Agriculture v. Moreno, 413 U. S. 528 [1973]; United States Dept. of Agriculture v. Murry, 413 U. S. 508 [1973]; U. S. Code, tit. 7, -§ 2011 et seq.)
This being a question of ordinary eligibility for regular food stamp issuance, the cases determining eligibility for emergency assistance, requiring a one-shot repair or replacement grant to forestall a household crisis, are distinguishable. (Cf. Matter of Hatfield v. Lavine, 42 A D 2d 855; Matter of Banks v. Wyman, 39 A D 2d 215, supra; Matter of Mitchell v. Wyman, 39 A D 2d 710.)
Lacking inclusion of home repair or maintenance as a shelter cost, the Zanellis’ net food stamp income falls above the prescribed maximum.
Accordingly, respondents’ determinations denying petitioners food stamp entitlement were not arbitrary or unlawful. The application is denied and the petition dismissed.

. The petition does not challenge other aspects of the State affirmance, to wit, the findings that (1) Mrs. Zanelli and her son constituted “one household,” rather than two as clamied at the fair hearing; and (2) there was no exemption of increased social security benefits from being counted as income.

. Some discrepancy in this figure came up at the fair hearing which the county and State set at $290, but which petitioners concede, without contradiction, should have been $320 because of increased social security benefits.

. Code of Fed. Reg., tit. 7, § 271.3, subd. (e), par. (1), el. (iii) provides “ Deductions [in computing Federal food commodity income] for the following household expenses shall be made: * * * (g) Shelter costs in excess of 30 percentum of the household’s income ”.

. This family’s food stamp eligibility appears problematic as of January 1, 1974 when the State Aged, Blind and Disabled assistance programs were transferred to the Supplemental Security Income program run by the Federal Social Security Administration with elimination of the food stamps program through inclusion of a food stamp bonus amount in the regular assistance grant. (See U. S. Code, tit. 42, § 1381 et seq.; U. S. Code Cong, and Admin. News 1972, vol. 1, p. 1715.) Assuming, then, that Angelo has been transferred to the Federal program with its built-in food stamp bonus grant, he is not now entitled to stamps. The effect of the changeover upon the food stamp eligibility of Mrs. Zanelli, who receives no public assistance, and upon the over-all household determination, appears uncertain. (See Fuller v. Nassau County Dept. of Social Services, 77 Misc 2d 677.)