Lyman H. Smith, J.
In this action for declaratory and injunctive relief, plaintiffs seek to have declared unconstitutional a portion of section 158 of New York’s Social Services Law, specifically that provision added by section 15 of chapter 76 of the Laws of 1976 (hereafter section 15). The plaintiffs, three individuals rendered ineligible for home relief benefits by this provision and two organizations whose membership includes persons likewise directly affected,[1] assert that section 15 is violative of provisions of the New York State Constitution which recognize the State’s obligation to provide for "The aid, care and support of the needy” (NY Const, art XVII, § 1) and the right of each person within our State to "the equal protection of the laws of this state or any subdivision thereof’. (NY Const, art I, § 11.)
This action was commenced on October 26, 1976 by service of a summons and complaint along with an order to show cause why the defendant State welfare commissioner should not be preliminarily enjoined from implementing the challenged statute. A preliminary injunction which the plaintiffs sought was granted on October 29, 1976 in an order which was affirmed by the Appellate Division on November 12, 1976. (Tucker v Toia, 54 AD2d 322.)[2] The Appellate Division also denied defendant Toia’s request for permission to appeal to the Court of Appeals on the preliminary injunction issue.
The defendant has answered the complaint and this court now entertains the plaintiff’s motions for a summary judgment and for class determination pursuant to CPLR 3212 and 902, respectively, and defendant Toia’s cross motion for sum *118 mary judgment. For the reasons set forth below, this court will grant plaintiffs’ motion for summary judgment and deny their motion for leave to represent a class of persons similarly situated.[3] Defendant’s cross motion for summary judgment will be denied.
FACTUAL BACKGROUND
New York provides for its needy through a number of programs, most of which are administered by local social services districts but which are established and mandated by the State’s Social Services Law.[4] The broadest of these programs, indeed the foundation for not only the State’s income maintenance programs but also its program of medical assistance for the needy, is the home relief ("HR”) program. There are no "categorical” eligibility requirements for the HR program and the aid provided pursuant to its provisions is available to (Social Services Law, § 158, subd [a]) "Any person unable to provide for himself, or who is unable to secure support from a legally responsible relative, who is not receiving needed assistance or care under other provisions of this chapter, or from other sources”.[5]
Prior to the enactment of section 15,[6] persons under 21 years of age who met the eligibility requirements of need, established by section 131-a of the Social Services Law, were granted aid notwithstanding the possible existence of legally responsible but noncontributing relatives.[7] Local social services officials were required by State regulations to determine the existence and whereabouts of legally responsible relatives, *119 their ability to contribute to the support of the applicant, and to initiate support proceedings in the applicant’s name where appropriate. (18 NYCRR 370.4.) The local districts are permitted to initiate actions to recover any public moneys provided to or expended on behalf of a recipient during any time within 10 years after the expenditure. (Social Services Law, § 104, subd 1.)
Since July 1, 1975, the State has required, as a condition of eligibility for aid to be given to the parents of needy children, that such parents co-operate in the identification, location and prosecution of noncontributing relatives. (Social Services Law, § 101-a.) These requirements have been applied to the parents of all needy children, irrespective of whether they seek to receive benefits under the HR program or the Federally subsidized aid to families with dependent children ("AFDC”) program.[8]
With the enactment of section 15 on March 30, 1976, this mechanism for obtaining contribution from responsible relatives was radically altered with regard to certain minor children who were theretofore eligible for grants of assistance under the HR program. That section amended subdivision (a) of section 158 of the Social Services Law by the following addition: "[Provided, however that no person under the age of twenty-one years except a married person living with their spouse, living apart from a legally responsible relative shall be eligible for home relief unless a proceeding has been brought by or on behalf of such person to compel such legally responsible relative to provide for or contribute to such person’s support and until an order of disposition has been entered in such proceeding. ” (Emphasis added.)
The implementation of this section was directed by defendant Toia, then the Acting Commissioner of the New York State Department of Social Services, on April 16, 1976, through the issuance of an administrative letter (76 ADM-35) which set out specific procedures to be followed by local social services districts.
*120 The immediate impact on those to be affected was twofold: first, the responsibility for obtaining a final order of disposition in the support proceeding was thrust upon those minor children who did not live with both of their legally responsible relatives and who were not "categorically” eligible for benefits under the AFDC program; and secondly, and more importantly for this discussion, children falling into the group affected by section 15 were to be denied all assistance until such a final order of disposition could be obtained against each responsible relative with whom the child was not living.[9]
The bureaucratic nightmare and individual hardship which was foreseen by many[10] was documented in affidavits presented to the Federal District Court in New York City which issued a temporary restraining order staying defendant Toia’s planned implementation of the statute on May 13, 1976. A three-Judge court was convened to hear claims that section 15 offended the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution. That court rendered a decision on September 13, 1976, upholding the statute against the Federal constitutional claims. (Rasmussen v Toia, 420 F Supp 757.)* [11]
Subsequent to a frustrated second attempt to implement section 15,[12] defendant Toia issued a fourth administrative letter, 76 ADM-98A, on October 19, 1976, directing that no HR benefits be provided beyond November 8, 1976, to any children who had not met the requirements of section 15.
*121 Plaintiff Tucker, a 19-year-old recipient of HR benefits who lives alone and who is presently two months’ pregnant, was to have been discontinued pursuant to 76 ADM-98A, prior to this court’s issuance of a preliminary injunction. She relies for her support entirely upon her monthly grant of public assistance. She first received notice on October 12, 1976, that these benefits would soon be withdrawn due to her failure to obtain a support order against her father, a resident of Mobile, Alabama.[13] It appears that a minimum of 10 weeks are required to process the necessary paperwork to accomplish even a default order under the Uniform Support of Dependents Law (Domestic Relations Law, art 3-A).
Plaintiff Felder is an 18-year-old woman who, until recently, lived with her mother, sister and four brothers, ranging in age from 3 months to 17 years. The sole source of support for this family was their AFDC grant of public assistance. After her graduation from high school, and unable to obtain employment, plaintiff Felder found it necessary to leave the family home. Her application for a separate grant of HR benefits was denied, pursuant to section 15, because she had not obtained an order of support against her absent father. It appears from the plaintiff’s papers that she had three times sought to file a petition in Monroe County Family Court and been unsuccessful because she did not know the whereabouts of her father, whom neither she nor any member of her family has seen in some 10 years.[14] She was finally permitted to file her petition after the intervention of supervisory personnel at the local social services office, but no action appears to have been taken with respect to that application.
Plaintiff Stewart is a recent recipient of AFDC benefits from the County of Wayne. He is 18 years of age and, until recently, received an AFDC grant along with his mother. In the late summer of this year, she became an inpatient at the Willard State Hospital and plaintiff Stewart moved to Rochester and applied for HR benefits from the County of Monroe. He was denied assistance, again pursuant to section 15, since he had not obtained a support order against his father, a man whom he has never seen and who abandoned the family home prior to his son’s birth.
*122 DISCUSSION
Central to the plaintiffs’ motion for summary judgment is their assertion that the language of section 1 of article XVII of the New York State Constitution, in providing that "The aid, care and support of the needy are public concerns and shall be provided by the state”, creates in the citizens of New York State a right which is fundamental to the relationship between the individual and the State.[15] Any right found to be "fundamental” is constitutionally protected from infringement by enactments of the State’s elected legislators and its chief executive, unless there can be shown a compelling governmental interest requiring the infringement, and that there exists no less restrictive means available to the State to achieve such a compelling State interest. (Atkin v Onondaga County Bd. of Elections, 30 NY2d 401, 404; O'Brien v Skinner, 31 NY2d 317, 320, revd on other grounds 414 US 524.)
The test which the courts have come to apply in determining whether an asserted right is "fundamental” directs us to the words and import of constitutional documents.[16] In its inquiry regarding the nature of asserted rights, a court "does not 'pick out particular * * * [rights], characterize them as "fundamental” and give them added protection’ * * * [but] simply recognizes, as it must, an established constitutional right, and gives to that right no less protection than the Constitution itself demands.” (Shapiro v Thompson, 394 US 618, 642 [Stewart, J., concurring]; San Antonio Ind. School Dist. v Rodriguez, 411 US 1, 31; Matter of Malpica-Orsini, 36 NY2d 568, 583 [Jones, J., dissenting].)[17] The rule thus stated by the United States Supreme Court has been echoed by our own Court of Appeals with regard to cases involving rights arising under the New York State Constitution (Matter of Malpica-Orsini, supra, p 583): "[W]hether a right or interest is to be held to be fundamental turns on whether such right is *123 * ** * 'explicitly or implicitly guaranteed by the Constitution.’ ”
The language of article XVII was added to our Constitution with its adoption in its present form following the Constitutional Convention held in 1938. If this court entertained any doubt as to the plain meaning of the words contained in section 1, it would be more than satisfied by a study of the legislative history of this provision.[18] Speaking through its chairman, Edward F. Corsi, the Constitutional Convention’s Committee on Social Welfare described this section as a "charter of human protection for the underprivileged, the destitute and the handicapped of our State”, written in "words which set forth a definite policy of government, a concrete social obligation which no court may ever misread” (emphasis supplied). (See 3 Revised Record of Constitutional Convention, pp 2125-2126 [1938].) The purpose of the provision was described as being twofold (p 2126): "First: to remove from the area of constitutional doubt the responsibility of the State to those who must look to society for the bare necessities of life; and, secondly, to set down explicitly in our basic law a much needed definition of the relationship of the people to their government.”
The obligation of the State to provide for the aid, care and support of the needy was recognized to be (p 2126) "as fundamental as any responsibility of government”.[19]
The State’s arguments that the language of section 1 of article XVII, providing that these obligations shall be met by the State "and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine”, renders this provision wholly precatory, and that *124 the intention of the Constitutional Convention was to declare no more than a statement of the State’s good intentions, are not well taken. Specific reference is to be found in the record of the proceedings concerning this language which clearly indicates that, while the method of performance of these obligations was within the purview of the Legislature, the obligation was to be established and recognized as mandatory upon the State. (3 Revised Record of Constitutional Convention, p 2125 [1938].)
In view of the plain language of the constitutional provision and the explicit legislative history available regarding the convention proceedings, the conclusion is inescapable that section 1 of article XVII of the New York State Constitution establishes a right fundamental to the relationship between the State of New York and its needy citizens. The fact that the Federal Constitution recognizes no such fundamental right (cf. Dandridge v Williams, 397 US 471; Jefferson v Hackney, 406 US 535; Lavine v Milne, 424 US 577) is irrelevant where it is the rights secured by State law or State Constitutions which are at issue. (See Board of Regents v Roth, 408 US 564, 577; Bishop v Wood, 426 US 341.) While the citizens of other States may not have sought or achieved the recognition of such a fundamental right, it is beyond question that the citizens of our State have done so.[20]
The abridgment of any fundamental right may only be sustained upon a showing by the State that the statute at issue advances some compelling State interest. (Atkin v Onondaga County Bd. of Elections, 30 NY2d 401, 404-405, supra.) Even in cases where the State succeeds in identifying some compelling interest, it must pursue this goal with the least possible encroachment upon the individual rights of its citi *125 zens. " '[I]f there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected * * * [interests] a State may not choose the way of greater interference. If it acts at all, it must choose "less drastic means” ’ ”. (Citations omitted.)
Although a recognition of the fundamental nature of the rights secured by article XVII thus casts serious doubt upon the legitimacy of any State action infringing on those rights and requires substantial justification by the State, plaintiffs’ claims arising solely under article XVII need not be reached here. The action of the State in the present case has not resulted in a uniform abridgment of the article XVII rights of all needy persons, or even of all needy children, and this court must first address the narrower question of whether section 15 violates the mandate of section 11 of article I of our Constitution, that all persons be accorded the "equal protection of the laws”.
Any analysis of an alleged conflict between a statutory enactment and our Constitution’s equal protection clause must begin with an identification of the groups which are alleged to be treated differently under the legislation. The mandate of the equal protection clause is that "all persons similarly circumstanced shall be treated alike”. (Matter of Patricia A., 31 NY2d 83, 88.) A valid claim that one has been denied the equal protection of the laws must, in the first instance, rest upon some legislative classification which treats similarly circumstanced individuals in a different manner.
In the present case the plaintiffs allege a classification which is obvious from the face of the statute and a rudimentary understanding of the Social Services Law. In order to meet its obligations to needy children, the State has developed a uniform standard of need and level of payments (Social Services Law, § 131-a), a unitary plan for child protection (Social Services Law, § 411) and a single plan for medical assistance (Social Services Law, § 363 et seq.). For the purposes of obtaining partial Federal reimbursement under part A of subchapter IV of the Social Security Act (US Code, tit 42, § 601 et seq.), the State has distinguished between those families containing children who meet the categorical eligibility requirements of the Federal act (see n 8, supra), designating them as AFDC recipients, and those who do not, leaving these families in the general HR category. This essentially arbitrary classification has heretofore been of little concern to *126 the children involved, inasmuch as the financial eligibility requirements and the levels of payment are virtually the same under the two programs.[21]
With the enactment of section 15, which imposes its additional eligibility requirements only upon children not living with AFDC-eligible relatives, this classification has become the critical factor in determining whether some concededly needy children will receive the aid, care and support of the State, as promised in section 1 of article XVII of the Constitution.[22] Through the imposition of the eligibility requirements found in section 15, the State has separated its needy children into two distinct groups: (1) those residing with one of the "enumerated” relatives, as to whom section 15 does not apply; and (2) those not living with one of the "enumerated” relatives, as to whom section 15 does apply; and treated these essentially similar groups in a substantially different manner.[23]
In determining whether disparate treatment of similarly circumstanced individuals offends our State’s Constitution it must first be decided which of two equal protection standards is to be applied. Were the right infringed upon by section 15 not a fundamental one, the plaintiffs would be required to show the classification to be unreasonable and arbitrary, or that it fails to "rest upon some ground having a fair and substantial relation to the object of the legislation”. (Matter of Patricia A., 31 NY2d 83, 88, supra.) They would be required to overcome substantial presumptions, both that the statute is constitutional and that the Legislature has performed the necessary functions of investigation and fact-finding in support of its determination to act. (Matter of Malpica-Orsini, 36 NY2d 568, supra.) While such questions would raise issues of fact precluding summary judgment for either party on the papers now before the court (cf. Jimenez v Weinberger, 417 US 628, 633), this court’s finding that a fundamental right is here involved dictates a different course of inquiry.
*127 When the right being abridged by a State-imposed classification is recognized as fundamental, the traditional "rational basis” test referred to above does not give adequate protection to those rights and a stricter standard of review is required.[24] (Montgomery v Daniels, 38 NY2d 41, 58, supra; Matter of Lalli, 38 NY2d 77, 81; Matter of Malpica-Orsini, supra, p 581; Marcia D. v Donald D, 85 Misc 2d 637, 640.) In such circumstances the burden of establishing the validity of the statute shifts to the State (Matter of Malpica-Orsini, supra, p 581), the presumptions in its favor no longer operative, and the defenders of the statutory classification must show both that (1) some compelling State interest supports the need for the challenged legislation; and that (2) no less restrictive measure could adequately advance such a substantial and compelling State interest. (Matter of Malpica-Orsini, supra, p 582; Atkin v Onondaga County Bd. of Elections, 30 NY2d 401, 404, supra; Dunn v Blumstein, 405 US 330, 342-343; Shapiro v Thompson, 394 US 618.) This determination, that article XVII establishes a fundamental right, must, of necessity, thrust upon the State the burden of establishing the constitutionality of section 15 under this strict scrutiny test "beyond a reasonable doubt”. (Cf. Matter of Malpica-Orsini, supra, p 570.)
Although this court has previously indicated, during the proceedings which resulted in the issuance of a preliminary injunction, that it considered the legislative history of article XVII to require a finding that a fundamental right was secured thereby, the State has failed to either advance arguments or make any offer of proof to meet its substantial burden under the second of the two equal protection tests. The defendant argues only that the classification established by section 15 is rationally related to legitimate objectives of fiscal integrity and solvency. This court will, nevertheless, review the apparent objectives of the Legislature to determine whether they rise to the level of a "compelling State interest” and meet the first prong of the strict scrutiny standard.
Chapter 76 of the Laws of 1976, a measure which not only established the eligibility requirement here at issue but also authorized a freeze on the rates at which the State reimburses hospitals and nursing homes for care and services provided to *128 recipients of Medicaid, was described by the Legislature to be necessary "to assure that funds are available for essential and critical medical services, the basic medical necessities for the needy are provided, and that critical assistance, care and health services will be available to all the people”. (L 1976, ch 76, § 1.) The Legislature proceeded to declare that a "state of emergency” existed as further support for its invocation of drastic measures to curtail welfare spending.[25] Inasmuch as the legislation following this declaration of concern neither establishes new programs nor expands the services or assistance available under programs already in existence, but rather attempts to reduce State and local expenditures for. human services, it is evident that the Legislature’s primary concern was fiscal in nature.[26]
The question of whether the interest of the State in effecting fiscal savings in the implementation of State welfare programs is of a sufficiently compelling nature to permit the abridgment of fundamental rights does not come to this court as one of first impression. As with other of the State’s obligations to its citizens,[27] the State may not refuse persons seeking public assistance in violation of their constitutional rights and justify such action solely on the ground of fiscal responsibility or necessity. (Jones v Berman, 37 NY2d 42, 56; Lopez v Wyman, 329 F Supp 483, supra ) The Supreme Court (Shapiro v Thompson, 394 US 618, 633, supra) spoke clearly on this issue in striking down State welfare residency requirements. "[The State] may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It *129 could not, for example, reduce expenditures for education by barring indigent children from its schools. Similarly, * * * [the State] must do more than show that denying welfare benefits to new residents saves money. The saving of welfare costs cannot justify an otherwise invidious classification.”
The Court of Appeals (Sgaglione v Levitt, 37 NY2d 507, 514) has been presented with matters involving fiscal concerns of a far greater magnitude than those at issue here and has found the courts powerless to avoid the mandates of our Constitution.
"The duty of a neutral court is clear even when it be utterly understanding of the extraordinary and troubled efforts by the officials of New York City, the State administration and the Legislature. As this court said in Birnbaum v New York State Teachers Retirement System (5 NY2d 1, 11), in a context converse to that here but involving identical principles: '[The retirement system] argues that if this court [so] holds * * * the system will be plunged into bankruptcy. The answer to that argument must be that * * * we are not at liberty to do otherwise’.
"Indeed, it should be said that that is the primary role of the courts in the American system in reviewing the constitutional validity of executive and legislative acts even if they bear the guise, and the courts are convinced that the guise reflects a reality, of necessity, distress and emergency. The courts did not make the Constitution; the courts may not unmake the Constitution.”
Where constitutional rights are infringed upon by actions of the State, justified only by a desire to reduce public expenditures, the courts must act to secure those rights "even though such * * * [infringement] might, perhaps, at least temporarily, promote in some respects the best interests of the public.” (Sloat v Board of Examiners, 274 NY 367, 370.)
The most recent example of the conflict between fiscal concerns and constitutional provisions intended to protect the interests of individual citizens involves the Legislature’s enactment of the New York City Emergency Moratorium Act (L 1975, ch 874, as amd by L 1975, ch 875), in which selected short-term obligations of the City of New York were "suspended” for three years in the face of that city’s "desperate fiscal paralysis”. (Cf. Flushing Nat. Bank v Municipal Assistance Corp., 40 NY2d 731 [1976].) The Court of Appeals was well aware of the fact that New York City could not pay its *130 maturing obligations as they became due but found, nonetheless, that the full "faith and credit” clause of our Constitution (NY Const, VIII, § 2) prohibited a moratorium on the payment of these notes.
"It is argued that the city has insufficient funds to pay the notes and cannot in good faith use its revenue powers to pay the notes. The city has an enormous debt and one that in its entirety, if honored as portions become due, undoubtedly exceeds the city’s present capacity to maintain an effective cash flow. But it is not true that any particular indebtedness of the city, let alone the outstanding temporary notes, is responsible for any allocable insufficiency. In short, what has happened is those responsible have made an expedient selection of the temporary noteholders to bear an extraordinary burden. The invidious consequence may not be justified by fugitive recourse to the police power of the State or to any other constitutional power to displace inconvenient but intentionally protective constitutional limitations.” (Flushing Nat. Bank v Municipal Assistance Corp., supra, p 736.)
What was evident to the Court of Appeals in the Flushing Nat. Bank case is also clearly understood by this court in the context of the legislation under consideration here: the Legislature, when faced with substantial financial concerns, has "made an expedient selection” of a distinct minority of its needy citizens and invidiously imposed upon them extraordinary burdens in violation of their constitutional rights. The provisions of article XVII no less than the full "faith and credit” provisions of article VIII, were adopted by the people of New York (p 736) "to protect rights vulnerable in the event of difficult economic circumstances”.[28] It is the essential character of constitutional documents and the rights they secure to be immune from the expediency which often recommends the infringement of individual rights in response to the crisis of the hour. "[I]t is a Constitution that is being interpreted and as a Constitution it would serve little purpose if all that it promised, like the elegantly phrased Constitutions of some totalitarian or dictatorial Nations, was an ideal to be worshipped when not needed and debased when crucial.” (Flushing Nat. Bank v Municipal Acceptance Corp., supra, p 739.)
The interest of the State in preserving its resources, which are well understood to be finite with regard to the ability of *131 the taxpayer to respond to ever increasing burdens, is indeed an important one. Legislative and executive actions reasonably related to the furtherance of such a goal will not, absent some special circumstance, be subject to judicial intervention. Such an interest does not, however, permit the infringement of constitutionally protected rights. This court must hold that, neither the articulated purpose of section 15, nor any other purpose which might reasonably be inferred from its enactment, can meet the "compelling interest” criteria of the equal protection test required to be applied in this matter. Accordingly, this court finds section 15 of chapter 76 of the Laws of 1976, insofar as it raises a substantial barrier to the efforts of some needy children to obtain the public assistance necessary to their maintenance of a minimal level of health, nutrition and security, but leaves other needy children, similarly situated, without such a barrier, to be in violation of the equal protection clause of section 11 of article I of the New York State Constitution.[29] The defendant will be enjoined from permitting any further implementation of this statute.
The plaintiffs have also moved, pursuant to CPLR 902, for an order determining their right to maintain this action on behalf of all others similarly situated. The defendant commissioner opposes such a determination on the ground that class certification is unnecessary in actions involving governmental operations, citing Jones v Berman (37 NY2d 42, supra) and other cases in which his department has been a defendant.
Although the plaintiffs would seem to meet the "substantive” requirements of the New York class action rule (cf. CPLR 901, subd a, pars 1-4), the Court of Appeals decision in Jones (supra) requires that the plaintiffs’ present motion be denied. Not only are governmental operations involved, a criteria which should not, perhaps, be determinative in every case,[30] but this court is satisfied that it can adequately protect *132 the interests of the alleged class by issuing a final order which, by its terms, will run to the benefit of each person affected by section 15. (Cf. Galvan v Levine, 490 F2d 1255, 1261.) Were this court considering such a motion in the early stages of a matter, where necessary provisional remedies would be largely ineffective to protect the interests of persons not parties but similarly situated, pendente lite, a situation to which the principle of stare decisis would clearly not apply, we would have to consider the "superior method” requirements of CPLR 901 (subd a, par 5) and 902 in a different light.[31] In the present case, however, a certification of the class is unnecessary.

. The standing of Rochester Action for Welfare Rights, Inc., and the Rochester Chapter of the National Clients Council to bring this action is not challenged and, in any event, is not open to serious question. (See National Organization for Women v State Div. of Human Rights, 34 NY2d 416, 419-420.)

. By an order dated November 1,1976, the Appellate Division, Fourth Department, vacated the stay of the preliminary injunction order, which stay flowed automatically from defendant Toia’s appeal (CPLR 5519, subd [a], par 1). An expedited hearing of the appeal was also ordered.

. Motions of the Community Service Society of New York, the Community Council for Greater New York, Community Action for Legal Services, Inc., and Brooklyn Legal Services Corporation "A” for leave to appear as amici curiae in this matter are granted.

. For discussion of the relationship existing between the State and local authorities under this statute (see Toia v Regan, 54 AD2d 46, affd 40 NY2d 837).

. The "other provisions” referred to in subdivision (a) of section 158 are the veterans assistance program established under title 4 of article 5; the aid to families with dependent children program established under title 10 of article 5; and the State participation in the supplemental security income program, pursuant to title 6 of article 5.

. This measure was signed into law by Governor Carey on March 30, 1976, and became effective, by its terms, 45 days later on April 14, 1976. (L 1976, ch 76.)

. Actual contributions by these persons were, along with available income and resources of any other kind, considered in determining whether the applicant for HR benefits was, in fact, needy within the standards established by section 131-a. (18. NYCRR 352.11.)

. To be eligible for benefits under the AFDC program a needy child must be deprived of the care and support of a parent because of his or her death, disability or absence from the home, and the child must reside in the home of one of several enumerated relatives, e.g., parent, grandparent, sibling, stepparent, uncle, aunt, nephew, niece or first cousin. (See, generally, Social Security Act of 1935, as amd by US Code, tit 42, § 601 et seq.) A child between the ages of 18 and 21 years must, in addition, be attending a full-time course of instruction in either high school, vocational training or college. (Social Services Law, § 349, subd A.)

. Subsequent clarification of this requirement came in the defendant’s administrative letter 76 ADM-45 which exempted persons whose noncontributing relatives were either deceased or themselves in receipt of public assistance.

. (See "New Albany Law May Cut 11,000 From Relief Aid”, New York Times, May 11, 1976, and "Welfare Cuts Clients — 600 Under 21 Dropped”, Rochester Times Union, May 3, 1976.) The affidavit of William B. Haley, submitted on behalf of the Community Service Society of New York and the Community Council for Greater New York, amici curiae, indicates that the backlog of cases in the New York City Family Court during recent months has reached nearly 20,000.

. See District Court Judge Haight’s opinion (Rasmussen v Toia, 420 F Supp 757, 762) for a further discussion of the impact of section 15. Although the Appellate Division has held that Rasmussen does not control this case (Tucker v Toia, 54 AD2d 322), its relevance will be discussed below.

. Due to the defendant’s failure to require local districts to advise those to be affected of the availaility of community legal services to represent them in administrative appeals (cf. 18 NYCRR 358.3 [d]) this court temporarily stayed all actions to be taken pursuant to the defendant’s administrative letter of September 24, 1976 (76 ADM-98). (Rochester Action for Welfare Rights v Toia, Sup Ct, Monroe County, Oct. 7, 1976.)

. Plaintiff Tucker’s mother is deceased.

. It is also alleged, without contradiction, that the Monroe County Department of Social Services has tried in the past to locate and obtain support from the father of this family, and found their efforts similarly unsuccessful.

. This claim distinguishes the present case from Rasmussen v Toia (420 F Supp 757, supra) where the parties plaintiff did not rely on the argument that section 1 of article XVII created rights which were "fundamental” in the constitutional sense.

. The powers of government continue to derive from "the consent of the governed”. (Declaration of Independence.) This consent and the only direct charge of the citizenry to its government are to be found exclusively in our State and Federal Constitutions.

. Judge Jones’ discussion of this issue has been adopted by the Court of Appeals in subsequent cases. (Cf. Montgomery v Daniels, 38 NY2d 41, 59, n 14; see, also, People v Santiago, 51 AD2d 1, 11, n 6.)

. Such an inquiry is as proper here as in a case involving the interpretation of statutory, as opposed to constitutional, provisions. (Matter of Dowling, 219 NY 44; Association for Protection of Adirondacks v MacDonald, 228 App Div 73, affd 253 NY 234.)

. In view of the State’s assertion that the present fiscal difficulties which face the State and its subdivisions constitute an interest sufficient to permit section 15’s infringement of the asserted right, the court notes that article XVII was apparently intended by its authors to protect the rights of destitute individuals from just such claims. Chairman Corsi’s reference to the "brutal callousness to human suffering * * * witnessed * * * in the State of New Jersey” (p 2126) undoubtedly reflected an awareness of the substantial financial burdens being imposed upon all levels of government in that period and the fact that the State of New Jersey had completely disbanded its State Relief Council in 1936. (See "All Relief Ends in Jersey; Local Areas Must Feed 270,000”, New York Times, April 17, 1936, p 1; New Jersey Relief Show-down Approaches, 25 Nat Municipal Rev 544.)

. While not having spoken explicitly in the terms related here, the courts of this State have continued to recognize the fundamental nature of the obligations imposed by this "constitutional mandate”. (Matter of Barie v Lavine, 48 AD2d 36, 38, affd 40 NY2d 565; see Toia v Regan, 54 AD2d 46, affd 40 NY2d 837, supra; Matter of Lee v Smith, 87 Misc 2d 1018; Fuller v Nassau County Dept. of Soc. Servs., 77 Misc 2d 677.) The recent decision of the Court of Appeals in Barie (supra, p 570) does not require a different conclusion here, as defendant Toia asserts, inasmuch as the issue presented there was not whether article XVII creates a fundamental right, but rather, do its protections extend to persons who are "needy” solely because they refuse to accept available employment opportunities. The Court of Appeals held only that such persons are not to be considered "needy” within the meaning of article XVII of our Constitution. It does not appear that the question of whether a fundamental right is involved was presented to the Court of Appeals in Barie nor, indeed, in any other reported case.

. Some working parents of AFDC-eligible children do receive a "work incentive” bonus which is not available to HR families. (Social Services Law, § 349-a, subd 1, par [b].)

. Note the situations of plaintiffs Felder and Stewart who each had received AFDC benefits immediately prior to being denied HR benefits pursuant to section 15.

. In finding against the Rasmussen plaintiffs on their claim under the Federal equal protection clause, the Federal court correctly found that the classification asserted in that case, i.e., HR-eligible children who could easily obtain a support order versus those who could not, was not created by the statute, and that such fact was fatal to their equal protection argument. (Rasmussen v Toia, 420 F Supp 757, 770 supra.)

. This more rigorous test is also required where the legislation establishes an inherently "suspect” classification, such as race (cf. Loving v Virginia, 388 US 1); alienage (cf. Graham v Richardson, 403 US 365); or national origin (cf. Oyama v California, 332 US 633). No such classification is alleged by the plaintiffs here.

. It is clear that, standing alone, legislative declarations of a "state of emergency” will not elevate State fiscal concerns to a position superior to that held by constitutional rights. (Cf. Lopez v Wyman, 329 F Supp 483, affd 404 US 1055, enjoining operation of New York’s welfare residency requirement.)

. A similar justification is offered by the State regarding its failure to impose section 15 requirements upon those needy children eligible, to receive AFDC benefits. Such action would presumably result in some withholding of Federal reimbursement or other sanction (cf. Lascaris v Shirley, 420 US 730).

. (See, e.g., Rinaldi v Yeager, 384 US 305, prohibiting discriminatory recoupment of appeal costs against certain unsuccessful criminal defendants; Deason v Deason, 32 NY2d 93, mandating county payment of service-by-publication costs on behalf of indigent divorce plaintiffs; Matter of Kesselbrenner v Anonymous, 33 NY2d 161, 168, mandating adequate treatment for "dangerously mentally ill” persons; Detainees of Brooklyn House of Detention for Men v Malcolm, 520 F2d 392, 399, mandating adequate facilities for pretrial detainees.)

. (See n 19, supra.)

. While unnecessary for the purposes of determining this motion, it is noted that the State has failed to put forward any argument regarding the second prong of the strict scrutiny test, i.e., the nonavailability of a less restrictive alternative to the challenged statute. The plaintiffs, although bearing no burden on this issue, point out the seemingly adequate mechanism requiring subrogation of support rights and requiring co-operation in identifying and obtaining support from noncontributing relatives, measures presently in use in the AFDC program and formerly employed in HR cases. (Cf. Social Services Law, § 101-a et seq.; Social Security Act, US Code, tit 42, § 651 et seq.)

. (See Pyramid Serv. Co. v New York City, NYU, Nov. 4, 1976, p 4, col 2; Echevarria v Carey, 402 F Supp 183,189.)

. In such a case the need to provide class-wide protection in advance of final judgment might well tip the consideration of these factors in favor of the plaintiff’s request.